**TOOMBS & CO., INC.**

v.

**The UNITED STATES.**

No. 337–79C.

United States Claims Court.

Feb. 16, 1984.

Bruce T. Rinker, Seattle, Wash., for plaintiff; B. Michael Schestopol and Oles, Morrison, Rinker, Stanislaw & Ashbaugh, Seattle, Wash., of counsel.

Robert G. Giertz, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

HARKINS, Judge.

Plaintiff brings a direct appeal under the Contract Disputes Act of 1978[1] from adverse decisions of the contracting officer on a fixed price contract to erect an air traffic control tower (ATCT) at Fairbanks, Alaska for the Federal Aviation Administration (FAA), Department of Transportation. The complaint (then a petition) was filed in the United States Court of Claims on July 30, 1979, amended on December 10, 1979, and was transferred to this court pursuant to section 403(d) of the Federal Courts Improvement Act of 1982.[2] The amended complaint contained nine counts (part of count 7 and all of count 8 have been withdrawn) that sought equitable adjustments for various items of work under the contract. One count (No. 3) was a claim for remission of assessed liquidated damages. Defendant asserts two counterclaims: one covers expenses incurred for an investigative test report relative to structural bolts installed by plaintiff; and, the other is for a test report on the magnitude and location of deficiencies in structural welds. The case was tried in Seattle, Washington on November 3–16, 1982; posttrial briefing was completed March 28, 1983.

Plaintiff is entitled to recover, in part, on four of its claims, and defendant is entitled to recover on its counterclaims.

---

1. 41 U.S.C. § 609 (Supp. V 1981).

2. 28 U.S.C. § 171 note (1983).

## FINDINGS OF FACT

1. (a) On January 28, 1977, the Alaskan Region of the Federal Aviation Administration (FAA) issued Invitation for Bid (IFB) No. AL55A–7–4 to solicit bids for construction at Fairbanks International Airport of a new air traffic control tower with two vehicle parking lots, plus all related civil, mechanical and electrical work. The ATCT was based on a standardized design that previously had been used at six other airports: Boise, Idaho; Augusta, Georgia; Fort Wayne, Indiana; Longview, Texas; Gulfport, Mississippi; and Springfield, Missouri. Contract specifications and Government drawings for the Fairbanks ATCT had been prepared by an architect/engineer consulting firm, Golemon and Rolfe (G & R or A/E), Houston, Texas, pursuant to a contract with the FAA Washington office. The lead civil engineer for the Fairbanks tower in the Alaska regional office, Richard L. Turnbull, had worked for 2 months in Houston in October—November 1976 with G & R to "site adapt" the standardized design for environmental conditions at Fairbanks.

(b) A representative of Toombs & Co., Inc. (Toombs) attended a pre-bid conference on February 15, 1977, during which FAA representatives explained the project. Toombs' representative also made a site investigation, during which he saw conditions at the proposed location of the tower and the proposed work areas.

2. (a) On March 31, 1977, Toombs and the FAA entered into construction contract No. DOT–FAA77AL–7918 for the construction of the new ATCT at Fairbanks International Airport for a fixed amount of $1,457,300.

(b) On April 1, 1977, Toombs entered into subcontracts with McCollough Painting Company; Bucher Glass Co., Inc.; Tanana Mechanical, Inc.; Markey Masonry; Northern Paving and Concrete, Inc.; Steel Erection & Engineering, Inc.; and Burbeck Roofing Company; to do various part of the work. By purchase orders on April 1 and April 14, 1977, in total amount of $54,269, Toombs subcontracted with H.H. Robertson

Co. to supply the metal siding panels for the tower required by Technical Specifications, Sections 7–3 and 7–5, of the contract.

3. Toombs & Co., Inc., located in Fairbanks, Alaska, has operated as a general contractor in Alaska since 1967. B.G. Toombs, president of Toombs, has been in the construction business for 33 years and has been in Alaska since 1958. In 1977, Toombs' business was conducted by a small staff that included the president, a vice president and secretary, an accountant, and a full-time estimator. Toombs also employed a foreman or project manager for each project, and construction laborers as required for work Toombs obtained in-house. Most of the work on Toombs' projects was by subcontractors for various phases of project work.

4. (a) The effective date of the notice to proceed was April 15, 1977, and all work was to be completed 470 calendar days thereafter on July 29, 1978. The original date for beneficial occupancy of the ATCT under Schedule IA, 270 days after the notice to proceed, was January 10, 1978.

(b) Toombs submitted complete sets of shop drawings on H.H. Robertson siding, sheet Nos. EP–1 through EP–10, to the FAA contracting officer (David C. Forsland) on April 13, 1977, who in turn had them forwarded to G & R in Houston for review and approval. During April and May 1977, G & R reviewed the shop drawings and made changes in the size of the "hood and louvers at the 1st floor elevations" and approved changes proposed by H.H. Robertson Co., for deletion or addition of various angles. During the review and approval process, representatives of G & R dealt directly with representatives of H.H. Robertson by telephone and correspondence. The contracting officer approved the H.H. Robertson shop drawings on May 5, 1977.

5. (a) By September 1977, work on the Fairbanks ATCT was approximately 85 percent complete. Subcontractor work on steel column welding and bolted connections had been completed and the structural steel was in place; concrete floors had been poured; concrete masonry block work on non-load

bearing walls had been installed; and metal siding panels had been installed on the greater part of each side of the tower.

(b) On September 19, 1977, fasteners connecting the metal siding panels sheared off at the 4th floor level of the south elevation; and when the fasteners broke, there was a rapid unrestrained expansion of the metal panels to as great as 3 inches away from the edge of the 4th floor. Subsequently additional fasteners broke loose at the bottom of the various panels at the 3rd floor level of the south elevation.

(c) In October 1977, the lead civil engineer for FAA on the project (R.L. Turnbull) observed defects in the masonry block work. Subsequently it was ascertained that grouting as required by the specification had not been installed, that vertical and horizontal rebar either had not been installed or had been installed improperly, and that the block walls had not been tied properly to adjoining walls, and were out of plumb.

(d) On November 9, 1977, the contracting officer directed Toombs to stop all work which might have an impact upon the correction of panel deficiencies. The stop work order included any work that would be affected should corrective action be required to bring the concrete block wall construction into conformity with specifications. The stop work order specifically applied to elevator work, interior sheet rock work, pipe, conduit, duct and cable tray work, and work on louvers and hoods that might block access to the concrete walls or outside walls. On December 16, 1977, the contracting officer approved a correction for deficiencies in the masonry block work and authorized that correction work commence.

(e) On February 9, 1978, the FAA resident engineer recorded that a check of bolted connections revealed that numerous bolts were not tightened to specifications. Subsequently it was found that some connections had bolts missing. Defective bolting was observed on all faces of the building on the 1st, 2nd and 3rd floors. Subsequent tests revealed that 95 percent of the high strength bolted connections were installed improperly.

(f) By February 24, 1978, corrective action on the concrete block walls was underway and the FAA notified Toombs the stop work order with respect to block wall repairs would be lifted for each floor as repairs were completed and accepted by the resident engineer. In the February 24, 1978, letter the FAA notified Toombs that the stop work order with respect to exterior metal siding continued in effect.

(g) On March 1, 1978, the FAA resident engineer directed Toombs to stop work with respect to bolt tightening on the ground that the bolts were not being tightened according to contract specifications. By letter on March 1, 1978, Toombs agreed to check all high strength bolted connections.

(h) The structural skeleton of the Fairbanks ATCT consisted of ten vertical columns. Nine columns were shipped in two parts and welded at the site. During a meeting on March 6–8, 1978, FAA representatives observed potential defective welds in the structural columns. Investigation revealed that all of the welded joints were defective in that they did not conform with specified requirements. Toombs corrected the defects by cutting out the old welding material one splice at a time during the period April 20 to May 16, 1978.

(i) On April 24, 1978, the correction of masonry block work had been completed and inspected; the stop work order with respect to block wall repairs was lifted on May 9, 1978.

(j) After welding defects in the structural columns had been corrected by Toombs, the FAA x-rayed the corrections and approved the welds towards the end of May 1978.

(k) On June 13, 1978, the FAA rescinded the November 9, 1977, stop work order relative to panel deficiencies and authorized Toombs to proceed with all construction work.

(l) Toombs tightened all high strength bolted connections and placed a hardened washer under both the head and the nut.

The bolt correction work was completed and accepted on July 24, 1978.

(m) Toombs installed the wall panels in the manner directed on June 13, 1978, and all such work was completed on August 11, 1978.

6. (a) During performance, there were 24 amendments to the contract by modifications Nos. 1–24. Time extensions were approved as follows:

1. Mod. No. 1: extended beneficial occupancy date 30 days for Schedules I–A, II–A, and I–C.

2. Mod. No. 6: extended beneficial occupancy date 25 days for Schedules II–A and II–C.

3. Mod. No. 7: extended beneficial occupancy date 2 days for Schedule II–C.

4. Mod. No. 13: extended beneficial occupancy date 57 days for Schedule I–A.

5. Mod. No. 15: extended beneficial occupancy date 7 days for Schedule I–B.

6. Mod. No. 16: extended beneficial occupancy date 15 days for Schedule I–B.

(b) Contract completion dates after the modifications were:

|  | Orig. Days | Add. Days | Total Days | Compl. Date |
|---|---|---|---|---|
| Schedule I–A | 270 | 87 | 357 | 4/07/78 |
| II–A | 150 | 55 | 205 | 11/ 5/77 |
| I–B | 350 | 22 | 372 | 4/22/78 |
| II–B | 470 | -- | 470 | 7/29/78 |
| I–C | 150 | 30 | 180 | 10/12/77 |
| II–C | 350 | 27 | 377 | 4/27/78 |
| I–D | 470 | -- | 470 | 7/29/78 |

7. (a) During performance, certain disputes between the parties were not resolved. On March 5, 1979, Toombs timely presented the following claims for equitable adjustments under the contract:

(1) Claim for additional work on H.H. Robertson Insulated Exterior Wall Panels—$100,476.65.

(2) Claim Re: Bolting Directives—$57,573.37.

(3) Claim arising out of Suspension of Work—$200,038,42.

(4) Claim Re: Directive Requiring Painting of Unexposed Structural Steel in Building—$9,231.

(5) Claim Re: Temporary Heat—$19,056.65.

(6) Claim for Remission of Assessment of Liquidated Damages—$181,000.

(7) Subcontractors and Miscellaneous Claims for Equitable Adjustment.

(b) On May 31, 1979, the contracting officer denied in their entirety Toombs' claims relative to the exterior wall panels, bolting directives, temporary heat and suspension of work. The contracting officer has issued an adverse decision as to all of Toombs'

claims, and due and timely notice of appeal was given by Toombs.

8. Special Condition No. 4 provided for the assessment of liquidated damages for untimely performance. Pursuant to this provision, liquidated damages were assessed and withheld in the amount of $181,000 for delay to the extent of 181 days during the period April 8, 1978, through October 5, 1978.

9. (a) Special Condition No. 14 required Toombs to submit "as built" shop drawings and construction drawings upon completion of the work. The IFB contained a schedule of the drawings to be provided to the FAA at the end of the contract as the "as built" drawings.

(b) In January 1979, Toombs submitted copies of "as built" shop drawings for the exterior metal wall panels and a full set of "as built" construction drawings. Toombs' drawing submissions were rejected as inadequate. Ultimately, the FAA completed the "as built" drawings in-house, and withheld from Toombs payment of $2,888 for the cost of preparing "as built" drawings.

10. (a) In connection with inspection of the welded connections and the high strength bolted connections in the steel structure, the FAA, on March 17, 1978, contracted with Alaska Testlabs for a report on bolted connections, and with Alaska Industrial X-Ray, Inc., for a report on all structural steel welded connections.

(b) The FAA paid Alaska Industrial X-Ray $5,171.55 for its report. Alaska Testlabs was paid $6,250.82 for its report.

EXTERIOR WALL PANELS

11. (a) Specifications for exterior wall panels were in Division 7, Moisture Protection, of the Technical Specifications. Section 7–3.1 required a metal siding exterior that conformed with specified drawings. Section 7–3.3.1.1 defined the steel faced factory foamed insulated wall panel—Type I, as 2 inches thick, and 24 inches wide minimum, or as detailed on drawings. Adjacent panels were connected by means of "a side joint of a tongue and groove shiplap design permitting the use of fasteners installed from the exterior that are completely concealed within the side joint." The specification required the side joint to permit the use of a clip to lock the "face sheet of the unit to the structural supports and provide positive resistance to negative load pulloff."

(b) Section 7–3.3.1.5 provided that the units were to be secured to the structural steel frame with approved self-tapping screws placed through "a pre-drilled pilot hole of 3″ long × 12 gauge galvanized steel clip angle concealed within the shiplap side joint of the basic unit." The combination of fastener and steel clip "shall be such so as to resist maximum negative pulloff loads and hold the face sheet mechanically to the structural building girts." FAA drawings depicted a panel that extended to three floor levels and was fastened by means of one clip at each floor level, installed on one side only of each panel.

(c) Section 7–3.4.3 provided panels "shall be erected in exact accordance with the manufacturer's approval and erection drawings."

(d) Section 7–3.6.1 required Toombs to furnish shop drawings that inter alia showed necessary reinforcements, anchorage and structural supports. Shop drawings were to be submitted to the contracting officer for approval before starting fabrication.

(e) The panel specification did not provide a listing of approved panel manufacturers or designate a particular source of panel supply. The panel specification did not provide a particular torque value or range of values to be used in installation of the self-tapping screws that connected panels to structural building girts.

(f) Sheet A–7 of the contract drawings provided by defendant specifies in section 22, applicable to panel connections at the 2nd through 5th floors, "Bolt as Panel Manufacturer Requires." Section 23, applicable to the 1st floor level at the end-of-panel condition, specifies "Anchor to Metal Panels w # 12 Self Tapping Screws."

(g) Sheet EP–1 of the Robertson Formawall shop drawings, reviewed by G & R and approved by FAA, specifies in ERECTION SEQUENCE, subparagraph (c), "Secure Panels to Girt with # 14 × 1¼″ Screw at Middle Hole of Clip. Auxiliary Holes May Be Used at Panel Ends." Item 4, FASTENER LEGEND, identifies the fastening screws for panels as follows: "G–505– # 14 × 1¾″—HEX, HD, CARB. STL. ZINC PLTD. SCR. TYPE 'AB'."

(h) Defendant provided a complete design of the exterior wall panel system by the technical specifications and drawings provided in the IFB and its system of review and approval of the manufacturer's shop drawings. The failure of the panel installation was a failure of the approved design.

12. Exterior wall panels manufactured by H.H. Robertson and installed on the Fairbanks ATCT complied with the technical specifications prepared by G & R and the FAA. The initial installation of the Robertson exterior wall panels was accomplished in accordance with standard design, as modified by G & R and the FAA, with materials specified in the contract docu-

ments, and was within the framework of Robertson's approved shop drawings.

13. (a) On September 23, 1977, Robertson provided a temporary correction for the panels on which the fasteners had failed. This correction involved the addition of a 3″ × 4″ × ¼″ angle to the building structure at floor levels (above the floor and below the beam), and the addition of two Fab-lok expansion fasteners installed through the inner wall at the ends of each panel. Although this correction initially was not considered by the FAA to be acceptable as a permanent correction, it essentially was the same as the permanent correction finally directed by the FAA.

(b) Notwithstanding a number of investigations by Toombs, Robertson and the FAA, the reason for the failure of the panel fastenings was not established. Toombs did not conduct a study of thermal expansion and did not prove that expansion due to solar radiation caused the panel connections to fail. The FAA did not prove that the failure was caused by defective or non-complying materials, the presence of chlorides, by overtorquing, or because of poor workmanship.

14. (a) The contracting officer on November 9, 1977, stopped all work which "might have an impact upon the correction of the panel deficiencies until such time as a permanent solution to correct the failure has been offered and accepted by the Government." On November 17, 1977, the contracting officer notified Toombs that "it is my determination that the failure of the exterior wall system is caused by defective materials" and requested Toombs to submit a proposal for correction of the problem no later than 2 weeks from the date of this letter. This request was reiterated by letters on December 15, 1977, on January 17, 1978, and on January 30, 1978. In this correspondence, the contracting officer noted that beneficial occupancy of the tower then was scheduled for February 9, 1978, and that the lack of progress to offer a solution to correct the deficiencies of the exterior metal wall panels was of grave concern because of related work by other parties. In the absence of a correction for the panel problem from Toombs, on February 9 and 10, 1978, the contracting officer initiated steps to have G & R "provide a viable and detailed recommendation for replacement and/or correction of the fasteners of the H.H. Robertson siding to the structure at the Fairbanks ATCT."

(b) At Toombs' request on January 26, 1978, Robertson developed a method to add fastener strength to the exterior wall panels through installation of additional angles above the floor and below the beam, to which the panels were secured by Fab-lok expansion fasteners. This correction differed from the design required for the initial panel installation and was similar to the temporary "fix" installed to resecure panels that had failed in September 1977. Robertson's drawings depicting its scheme for using Fab-lok fasteners for the inside fastening approach were transmitted to Toombs on February 15, 1978, and Toombs on February 22, 1978, submitted the Robertson correction drawings to the FAA. The drawings showed the location of 2½″ × 2½″ × ¼″ angles secured by ⅜″ bolt and nut to the structure, with two Fab-lok fasteners per panel inserted through the inside wall. The contracting officer on February 23, 1978, forwarded the Robertson suggested correction drawings to G & R.

(c) On February 24, 1978, the contracting officer and FAA Alaskan region personnel conferred and agreed that the "solution or suggestion for corrective procedures to the exterior panel problems submitted by H.H. Robertson through Toombs was acceptable." The conferees concluded that, until G & R received and reviewed the proposals "we cannot issue an acceptance to the contractor."

(d) On March 14, 1978, the contracting officer notified Toombs that G & R "is preparing design details for correcting the exterior panel deficiencies, based on H.H. Robertson's suggested corrective proposal, which will be completed and forwarded as soon as possible." The detail package for panel corrections arrived in Anchorage on March 21, 1978.

(e) On April 3, 1978, the contracting officer requested the lead civil engineer to furnish, for transmittal to Toombs, a set of the panel correction design details G & R had approved. On April 4, 1978, the lead civil engineer acknowledged that G & R approved correction details had been received, but declined to furnish a set for transmittal to Toombs because "the proposed corrections might be influenced significantly by the necessities for column weld corrections, bolt testing and corrections." On April 6, 1978, the contracting officer notified Toombs that FAA inspection and analysis of structural welds would be completed and a method of correction would be furnished on April 7, 1978, that approximately 10 working days would be required to inspect the structural bolts, analyze the results and develop corrective action; and stated: "While you are completing required corrective action on the bolts we will be finalizing the details required to correct the exterior panel attachments." ·

15. (a) On June 13, 1978, the contracting officer transmitted to Toombs a set of the G & R drawings for correction of the panel problem. These drawings were prepared by G & R on the basis of H.H. Robertson's shop drawings. The drawings showed 3″ × 3″ × ¼″ angles secured to the concrete floors by ⅜″ bolts and 4″ × 6″ × ¼″ angles welded to the beams of the structure, with the panels secured by two Fab-lok fasteners per panel through the inside wall of the panel. The directive stated that the drawings were premised on the assumption that the siding system would remain in place and that any changes from the drawings wanted by Toombs should be submitted for approval "within 10 calendar days from the date of this letter." The letter directed Toombs "to proceed immediately to correct the panel deficiencies as shown in the enclosed drawings or an approved deviation, and to resume work on all phases of the construction work remaining to be completed." By a separate letter on June 13, 1978, the contracting officer notified Toombs that the November 9, 1977, stop work order was rescinded in its entirety.

(b) The June 13, 1978, instruction relative to correction of panel connections constituted a change under the contract that should have been implemented by a formal contract modification that authorized additional compensation and an extension of time.

(c) Panel repairs began on July 7, 1978. On August 11, 1978, Toombs completed installation of the panels pursuant to the June 13, 1978, directive.

## HIGH STRENGTH BOLTED CONNECTIONS

16. (a) Division 5 of the Technical Specifications covered structural metal. Section 5–1.3.3 required high strength bolts to conform to ASTM A 490, and to be installed in accordance with the American Institute of Steel Construction (AISC) specification for structural joints using ASTM A 325 or A 490 bolts.

(b) The structural steel specified for the tower was A–36 steel; A 490 bolts were specified for the high strength bolted connections. A–36 steel has a specified minimum yield point of less than 40 ksi (thousand pounds per square inch), and is classified as a "mild" steel.

(c) AISC installation specification 5(b) required that A 490 bolts would have a hardened washer under the element (nut or bolt head) turned in tightening, and, additionally, that a hardened washer would be used with all A 490 bolts under the element not turned in tightening if the material against which it bears has a specified minimum yield point of less than 40 ksi.

(d) ASTM A 490 bolts were specified for high strength steel bolted connections at certain locations in the tower structure to provide friction connections designed to seismic zone 3. In March 1978, when the bolting deficiencies were discovered, bolted connections in the tower were bearing connections that did not comply with contract requirements.

17. (a) On March 20, 1978, the FAA notified Toombs that it had made arrangements with Alaska Testlabs, Anchorage, to

perform an inspection of all structural bolted connections prescribed by the AISC specifications. Analysis of Alaska Testlabs' May 15, 1978, report, and other inspections, disclosed that no high strength bolted connection met AISC specifications, 95 percent were loose, and only one washer had been installed at locations where two were specified.

(b) On May 26, 1978, the contracting officer directed Toombs to take, inter alia, the following corrective actions:

"(1) Replace all bolts (A490) at high strength connections with new A490 bolts with a hardened washer under both the bolt head and the nut. This replacement must be accomplished in compliance with the AISC requirements. AISC prohibits the reuse of A490 bolts.

"(2) Provide all necessary shoring, bracing, or other means of protection to insure the structure's integrity while corrective work is being performed. As an added precaution to this corrective work, you are required to check the building for drift. Drift checks shall be made at the beginning, middle, and completion of corrective work and may be accomplished by checking with a plumb line in the elevator shaft."

(c) On May 31, 1978, Toombs notified the FAA it was proceeding as directed and the work would be commenced after the A 490 bolts and additional washers were purchased and received. On June 12, 1978, Toombs directed its subcontractor, Steel Engineering and Erection, Inc., to perform the corrective work and listed the following items as valid reasons for the corrective work:

"Approximately 95 percent of the bolts have been proved to be inadequately tightened to meet specification requirements.

"Two washers were not installed on 100 percent of the bolts starting from the ground floor up.

"Approximately 120 bolts were overtorqued and must be removed and new bolts installed.

"Approximately 40 bolts installed with inadequate threads through the nuts.

"In a good many instances up to three different lengths of bolts were used at the same column correction, where 6 or 8 bolts of the same length are required. "Various nuts installed backwards."

18. (a) Toombs requested the FAA to waive the prohibition against reuse of some of the A 490 bolts on the ground that bolts which had not been tightened in the original installation were not overtorqued or stressed. No waiver was requested for A 490 bolts which tests showed had been overtorqued. The FAA granted the requested waiver and permitted A 490 bolts which had not been tightened on the original installation to be reused. Toombs also requested a waiver of the requirement for a washer under both the turned element and the element not turned when A 490 bolts were used with A–36 steel. This request was based upon the contention that the A–36 steel utilized in the structure, in fact, had a minimum yield of more than 40 ksi. The FAA rejected this request.

(b) Toombs tightened all bolted connections, and placed a hardened washer under the element turned and the element not turned as required by the AISC specification. At no time during the course of the correction was any drift in the structure observed. The bolted connection work was commenced on June 24, 1978, and was completed on July 24, 1978.

## PAINTING UNEXPOSED STRUCTURAL STEEL

19. (a) During the course of construction, the FAA deleted a requirement for certain suspended ceilings and as a result steel beams which previously had been hidden by the ceilings were exposed. The contract required Toombs to paint "exposed" surfaces. Toombs was directed to paint the structural steel exposed by removal of the ceilings. This work was additional and beyond the scope of the contract requirements.

(b) The additional work required the painting subcontractor, McCollough Paint-

ing, to provide 45 additional hours of work of the foreman, 35 for the painter and 20 additional hours administrative work.

(c) McCollough's invoice for the additional work was $4,117; Toombs' add-on for overhead, profit and insurance was $1,169.13, for a total of $5,286.13 for McCollough's work. Toombs' work, adjusted, amounts to $3,560.19. Toombs is entitled to $8,846 and a time extension of 6 days.

## TEMPORARY HEAT

20. (a) Special contract condition No. 18(e) provided that temporary heat was to be furnished during construction by the contractor. Technical Specification § 15–1.12 required express permission from the contracting officer to use the permanent heating equipment for temporary purposes during construction.

(b) Prior to submitting its bid on the contract, Toombs did not request or obtain permission to use the permanent heating system for temporary heat during construction. Toombs' bid included an amount for expenses associated with temporary heating of the building, which amount included the cost of fuel for use in the permanent heating system during the construction period.

(c) On December 15, 1977, Toombs requested the FAA's "consent to utilize the permanent heating equipment to provide heat in the building." Toombs noted that such use of the system would require the "completion of the heating and control systems, and connection of the air intake ducts to the louver frames." On December 22, 1977, the contracting officer granted Toombs' request to utilize the permanent heating system for temporary heat, subject to certain conditions that Toombs should supply the needed fuel, ensure that all equipment warranties begin on the date of final acceptance by the FAA, provide maintenance and repair service, and turn over the equipment to the FAA at the end of construction in "like new" condition.

(d) In January 1978, when Toombs activated the boiler, it found that the 30 psi boiler was not strong enough to force the water in the system to the 6th floor of the control tower. Heat would reach only to the 4th floor level.

(e) The FAA evaluated several alternative solutions for correcting the boiler pressure problem and advised Toombs that it would transmit its corrected design as soon as possible. Toombs was permitted to use the 30 psi boiler for whatever temporary heating it would provide. During the winter of 1977–78, Toombs' source of temporary heat was provided by oil-fired heaters, primarily.

(f) The FAA requested Toombs to provide a proposal for the removal of the 30 psi boiler and its replacement with a new 60 psi boiler. On March 1, 1978, Toombs provided a proposal to furnish and install a 60 psi boiler for the sum of $19,918.29. This proposal was not accepted; and Toombs was told to continue the installation of the 30 psi boiler as required by the contract specifications; Toombs completed construction. Thereafter, the FAA installed a 60 psi boiler under a different contract with another contractor.

## AS BUILT DRAWINGS

21. (a) The IFB attached a schedule of the drawings which were to be provided to the FAA at the completion of the work as the "as built" drawings. Special Contract Conditions No. 14 required Toombs to submit "as built" shop drawings upon completion of the work. After Toombs had completed performance, it requested all of its subcontractors to submit copies of "as built" drawings to it.

(b) In January of 1979, as part of its "as built" drawings submittals, Toombs submitted copies of the "as built" shop drawings for the exterior metal panels. These panel drawings did not reflect actual conditions on the job site. Toombs resubmitted the drawings at the end of March, 1979, but this submittal was inadequate because it did not reflect all modifications. In June 1979, Toombs resubmitted the "as built" panel drawings. This resubmittal was not acceptable to the FAA. Thereafter Toombs was told that the FAA would have the "as

built" drawings for the Robertson panel installation prepared by the FAA, with Toombs to be charged for that effort.

(c) On January 19, 1979, Toombs purported to submit a "full set" of "as built" construction drawings. These construction drawings were not accepted by the FAA because they did not reflect modifications and various field changes made during performance. Toombs resubmitted "as built" construction drawings on April 16, 1979. This submittal was rejected. The FAA completed preparation of the "as built" construction drawings in-house, and charged Toombs with the resulting cost.

(d) The FAA resident engineer was responsible, in part, for examining the "as built" drawings to determine whether they reflected actual field conditions. The resident engineer's examination disclosed that Toombs' submittals did not reflect actual conditions as installed and accepted. Completion of the "as built" drawings was done by the FAA at a cost of approximately $2,888. This amount was withheld from payment to Toombs.

## SUSPENSION OF WORK

22. (a) Failures in exterior wall panel connections and deficiencies in concrete block wall construction warranted the FAA's November 9, 1977, order to stop all other work that would interfere with or prevent action that would be required to correct the problems.

(b) A correction for block work deficiencies was known in December 1977; corrective work was underway in January 1978; and the order to stop other related work was lifted on a floor-by-floor basis on February 24, 1978.

(c) By February 24, 1978, the FAA Alaskan region personnel and the contracting officer had agreed upon a procedure to correct the exterior wall panel connection. The G & R approved correction details had arrived in Anchorage on March 21, 1978, and were available to the FAA Alaskan region personnel for distribution to Toombs.

(d) In February 1978, deficiencies in the installation of bolted connections were discovered; corrective action procedures were known by May 26, 1978.

(e) Deficiencies in steel column welds were discovered during the period March 6–8, 1978; by April 28, 1978, welds had been corrected on four of the nine columns; and all welds had been corrected by the end of May 1978.

23. (a) The deficiencies in Toombs' work relative to block wall construction, steel column welds, and high strength bolted connections made all work on the ATCT suspect and warranted caution until FAA personnel ascertained the scope of the work that would be needed for correction of defects.

(b) FAA personnel had an obligation not to interfere with expeditious correction of deficiencies and completion of the contract.

(c) FAA personnel failed to cooperate with Toombs by a timely lifting of the stop work order relative to panel corrections so as to allow other work to proceed sequentially in phases on a floor-by-floor or exposure-by-exposure basis as other corrections were completed.

24. (a) The main problem with implementing corrections to bolted connections was gaining access to the connection. In some cases, access required the erection of scaffolds and ladders, the chipping of concrete, the cutting of structural members or the removal of panels. Other work could have proceeded without interference to correction of bolted connections as such corrections were made.

(b) For some areas of the ATCT, the stop work order applicable to panel corrections could have been lifted after April 3, 1978, for other work. The stop work order applicable to bolted connections should have been lifted on May 26, 1978.

## DISPOSITION

The parties were unable to establish a reason for the. failure of the wall panel connections. Plaintiff contends the cause was thermal expansion due to solar radia-

tion; but this was not proven. Defendant explored, but did not prove, that the failure was caused by defective or noncomplying materials, corrosive chlorides, overtorquing, or poor workmanship. In this situation, therefore, responsibility as between the parties for the panel failure will have to be determined by the nature of the relationship established by the contract's terms and by the activities of the parties.

Of particular significance in definition of the contractual relationship is the unique and pervasive position of the architect/engineer consultants in the design and construction of the Fairbanks ATCT.[3] The consultants' services were provided through a contract with FAA's Washington office, where they had developed a standardized design which had been used at six other airports.

Plans and specifications for the Fairbanks ATCT were produced by the consultants and FAA Alaskan region personnel at the consultants' Houston, Texas, offices during the period October 1976—January 1977. During this period, the design of the standardized air traffic control tower was "site adapted" for earthquake zone III ratings and other environmental conditions at Fairbanks.

Control by the consultants over the tower design and construction details continued after contract award. Shop drawings for the wall panels were reviewed by G & R in April and May 1977. In this review, the consultants did not work through the contracting officer and the prime contractor; G & R dealt directly with the panel supplier, Robertson. The shop drawings were changed to add angles for wind bracing and other alterations were authorized to site adapt the Fairbanks design.

After initial investigation of the panel connection failure, G & R advised the FAA Washington office on October 13, 1977, to make sure that the "specifications and manufacturer's approved erection drawings and procedures be followed." Continued re-

liance by Fairbanks personnel on the A/E consultants, and the consultants' control over implementation of the tower design, is shown by the steps in the development of the panel correction. On February 10, 1978, the Fairbanks planning branch requested the Washington office to have G & R prepare design changes for suspended heavy equipment, for replacement of an inadequate 30 psi water boiler with a 60 psi boiler, and to "provide a viable and detailed recommendation for replacement and/or correction of fasteners of the H.H. Robertson siding to the structure at the Fairbanks ATCT." On February 24, 1978, although the Fairbanks personnel, including the contracting officer, agreed that the panel correction proposed by Robertson and Toombs "was acceptable," they concluded "until the A/E receives and reviews the proposals we cannot issue an acceptance to the Contractor."

### 1. Exterior Wall Panel Claim

Defendant contends that the specification with respect to the fastening system which failed is in the nature of a "performance" specification in which the successful bidder was free to select appropriate fasteners, and was required to elect fastening screws which would be strong enough to resist negative loads. Defendant asserts that the contract did not establish "the type, size, strength, or material required of the fastening screws."

Defendant is not persuasive. The contract documents, and the role of the A/E in this procurement, establish that defendant provided a complete design of the wall panel system. The FAA, through G & R, had such control over the materials to be used and the manner the work was to be performed that the contract plans and specifications were in the nature of design specifications rather than performance specifications. This is not a contract where the successful bidder was expected to exercise ingenuity to achieve an objective or stan-

---

**3.** The A/E consultants were a joint venture composed of Lockwood, Andrew & Newnam (LAN) which provided advice on structural and civil engineering services, and Goleman and Rolfe (G & R), architects. For convenience, G & R is used to refer to A/E consultants.

dard set forth in the specifications.[4] G & R's review and approval of the shop drawings was tantamount to their incorporation in the specification.

Defendant points to Article 15 of the General Provisions, Standard Form 23A, and to Paragraph 14 of the Special Contract Conditions for the proposition that contracting officer approval did not alter the performance aspects of the specification.[5] These general disclaimers are insufficient to overcome the detailed requirements of the contract documents and the control in fact exercised by the consultants over the materials to be used and the manner the work was to be performed. The elaborate system which prepared and reviewed contract actions before and after approval by the contracting officer of the shop drawings removes this case from the simple approval action for which the cited clauses were designed. Defendant may not be permitted to erect a system in which its control over implementation of its design is complete, and at the same time avoid responsibility for the consequences of defects in the plans and specifications by such general disclaimers. Accordingly, defendant must be held to the standard that is appropriate to a "design" specification. Traditionally Government contractors have not been held responsible when the Government's plans and specifications are inadequate. There is an implied warranty that conformance with the Government's requirements will result in satisfactory completion of the work.[6]

The technical specifications for the exterior wall panels and the contract drawings provided by FAA described the panel, the fastener clip and location of the connection, in detail, and required the panels to be erected in exact accordance with the manufacturer's drawings. Notwithstanding the recitals about resistance to negative load pulloff, the FAA's contract documents did not permit the contractor scope to develop means and methods to achieve the end result as in a performance specification.[7] Sheet A–7 of the FAA's drawings for panel connections at the 2nd through 5th floor levels, specified: "Bolt as Panel Manufacturer Requires." The shop drawings provided a detailed Erection Sequence that established the size and location of fastening screws. The fastener's legend established that fastening screws for panels were to be carbon steel, zinc plated, hexagonal head, No. 14, 1¾ inch, screw type .AB. Fairly read, the specifications establish in precise detail the type, size, strength and materials required of the fastening screws.

Initial installation of the panels by plaintiffs' subcontractor was accomplished in accordance with the requirements of the approved shop drawings. Defendant contends that plaintiff has the burden of proof to establish that defects or errors in the specification caused the difficulty encountered. Plaintiff's burden is less when there is an implied warranty that compliance with the specifications is adequate for satisfactory performance. When the contractor has shown that, notwithstanding substantial compliance with the Government's plans and specifications the result was defective, the Government to avoid liability

4. *J.L. Simmons Co. v. United States,* 412 F.2d 1360, 1362, 188 Ct.Cl. 684 (Ct.Cl.1969).

5. Article 15 of the General Provisions provides in part:
"(b) ... Approval by the Contracting Officer shall not relieve the Contractor from responsibility for any errors or omissions in such drawings, nor from responsibility for complying with the requirements of this contract, except with respect to variations described and approved in accordance with (c) below."
Paragraph 14 in the Special Contract Conditions provides in part:
"... The approval of the drawings by the Contracting Officer shall not be construed as a complete check, but will indicate only that the general method of construction and detailing is satisfactory. Approval of such drawings will not relieve the Contractor of the responsibility for any error which may exist as the Contractor shall be responsible for the dimensions and design of adequate connections, details, and satisfactory construction of all work."

6. *United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *J. McShain, Inc. v. United States,* 412 F.2d 1281, 1283, 188 Ct.Cl. 830 (1969).

7. *Penguin Industries, Inc. v. United States,* 530 F.2d 934, 937, 209 Ct.Cl. 121 (1976).

must go forward with proof that defective materials, defective workmanship, or some other causes, produced the unsatisfactory result.[8] Here, the record supports the conclusion that the initial installation followed the specification, but the reason for the panel connection failure was not established. Defendant did not show that the failure was caused by defective or noncomplying materials, the presence of chlorides, by overtorquing, or because of poor workmanship. In these circumstances, plaintiff has carried its burden and is entitled to an equitable adjustment for the additional costs and time incurred.

The panel correction directed by the FAA on June 13, 1978, changed the original design substantially. The correction involved the addition of anchorage points by angles bolted to the concrete floors and welded to tower steel skeleton. In addition, the correction required penetration of the interior panel wall. Initially, such penetration was to be voided because it could result in separation of the foam layer, and derogate from winterization thermal requirements. The temporary correction in September 1977 was not acceptable on this basis, and the February 10, 1978, request to have G & R provide a correction for the panel failures continued the requirement that: "Winterized adaption parameters will be maintained, i.e., no 'through-wall' metal."

■ It is clear that the approved design and specifications were required to be changed. Responsibility for the change is defendant's. Installation of the panel correction pursuant to the June 13, 1978, direction was done in the period July 7 through August 11, 1978, and required 31 work days. Additional costs incurred by plaintiff in installation of the correction amounted to $100,476.65 (labor and material costs of $78,254.36, plus 15 percent overhead, 10 percent profit and 1½ percent bond and insurance). Plaintiff's claim was audited by defendant; defendant does not challenge plaintiff's overhead and other add-on rates. In the absence of any challenge to the costs claimed by plaintiff, they are found to be reasonable. Plaintiff is entitled to recover $100,476.65 on count 1, and is allowed a time extension of 31 days.

## 2. Suspension of Work Claim

■ Plaintiff seeks an equitable adjustment under the suspension article for the 325 day period from September 19, 1977, through August 11, 1978,[9] on the ground that the entire period was an unreasonable delay because it was due to defective or erroneous Government specifications.[10] Plaintiff disregards the fact that during most of this period, plaintiff's exceptionally shoddy work warranted concurrent suspensions. The suspension article in this contract does not authorize an adjustment for any suspension to the extent that performance would have been so suspended "by any

---

**8.** *R.E.D.M. Corp. v. United States,* 428 F.2d 1304, 192 Ct.Cl. 891 (1970); *R.C. Hedreen Co.,* ASBCA No. 20599, 77–1 BCA ¶ 12,328 (1977).

**9.** General Provisions, Article 17, provides in part:

"17. Suspension of Work

"(a) The Contracting Officer may order the Contractor in writing to suspend, delay, or interrupt all or any part of work for such period of time as he may determine to be appropriate for the convenience of the Government.

"(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of this contract, or by his failure to act within the time specified in this contract (or if no time is specified, within a reasonable time), an adjust-

ment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by such unreasonable suspension, delay, or interruption and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent (1) that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor or (2) for which an equitable adjustment is provided for or excluded under any other provision of this contract."

**10.** *Citing Chaney & James Const. Co. v. United States,* 421 F.2d 728, 190 Ct.Cl. 699 (1970).

other cause, including the fault or negligence of the contractor." [11]

It is significant that in this case both parties were exceptionally delinquent in on-site supervision and inspection to assure that the subcontractors' work was properly performed. Plaintiff, of course, must shoulder the burden for this failure. The work was 85 percent complete before it was ascertained that the masonry block walls from the 1st through the 6th floors had multiple defects, that 95 percent of the high strength bolted connections were installed improperly, and that all of the welded joints in the structural steel columns were defective.

The suspension was ordered effective November 9, 1977 (not September 19, as plaintiff contends), to deal with panel deficiencies observed in September 1977 and with masonry wall defects that had been uncovered in October 1977. On February 9, 1978, defects in the bolted connections were noted, and in March 6–8, 1978, defective welded joints were uncovered. Corrections to masonry walls were not completed until April 24, 1978; corrections to welded joints were not finished until the end of May 1978; and a correction for the bolted connections was not determined until May 26, 1978.

The high strength bolted connections were specified in the ATCT in order to assure rigidity appropriate to a "zone 3" seismic area. Until the tower was "bolted up" this contract requirement to which plaintiff had agreed could not be satisfied. In the circumstances, it was reasonable for the FAA to suspend work until a correction for the bolted connection defects was known. The deficiencies with masonry walls, welded joints and bolted connections were plaintiff's responsibility, and any defects in specifications applicable to panel installation do not bear upon the reasonableness of concurrent suspensions for these other causes.

G & R's correction for panel connections was available in Alaska for distribution to plaintiff on March 21, 1978. In the interest of expeditious completion of this already delayed contract, the approved panel correction should have been forwarded so that necessary materials could be procured and available when work could be authorized to correct the high strength bolted connections.

The suspension was lifted as to all work on June 13, 1978, and both panel corrections and bolting corrections were done concurrently in the period July 7 through July 24, 1978. If defendant had lifted the suspension for all work on May 26, 1978, when the bolting correction was known, the work could have gone forward at that time with proper contractor coordination. For this reason, defendant's delay from May 26 to June 13, 1978, in removal of the suspension order is not reasonable and is unacceptable under the suspension article.

Accordingly, plaintiff is not entitled to an equitable adjustment for improper suspension of work for the period November 9, 1977, through May 26, 1978. Plaintiff is entitled to an adjustment for costs incurred during 18 days unreasonable suspension from May 26 to June 13, 1978. Plaintiff claims its additional expenses, by way of additional job site and home office overhead, amounts to $923.14 per day. This amount, however, is derived from the claim in count 2 of the complaint of $199,398 for 216 days from November 9, 1977, through June 13, 1978, and includes a 10 percent profit rate. General Provision Article 17(b) excludes profit from a computation of the suspension of work adjustment.

3. Painting Structural Steel Claim and Subcontractor Claim

Count 5 asked for an equitable adjustment for compliance with directions to paint certain unexposed structural steel, and count 7 covered miscellaneous claims for extra work by certain subcontractors.

11. *See Merritt-Chapman & Scott Corp. v. United States,* 528 F.2d 1392, 1397, 208 Ct.Cl. 639 (1976).

■ As a result of proof elicited at trial, defendant acknowledges that the unexposed structural steel claim properly was calculated on the basis of manhours of work, and not upon a square footage of painted surfaces, to which defendant initially had objected. Defendant concedes that plaintiff is entitled to an adjustment of $8,846 for additional painting. This extra work required 6 days, and plaintiff also is entitled to a time extension of that amount.

### 4. Liquidated Damages

The contract provided for liquidated damages based on completion dates for various sections of the work.[12] The ATCT (Schedule I–A) was subject to a $1000 per day assessment for delay in completion to the day of beneficial occupancy (Substantial Completion). Modifications to the contract extended completion of Schedule I–A to April 7, 1978. On July 12, 1978, the contracting officer notified Toombs that the tower structure was not available for beneficial occupancy on April 8, 1978, that current completion remained at 85 percent, and that liquidated damages at $1000 would be assessed for each calendar day of delay beyond the completion date. Defendant assessed liquidated damages for 181 days from April 8, 1978, through October 5, 1978.

■ Plaintiff seeks remission of the entire $181,000 assessment on the ground that when both parties are at fault and are responsible for the delay, liquidated damages cannot be recovered from the contractor.[13] Plaintiff paints with too broad a brush. When it is reasonably possible to apportion the delay among the various causes, liquidated damages may be assessed notwithstanding concurrent causes attributable to both parties.[14]

■ In this case, plaintiff is entitled to 31 additional days for work in installation of the panel correction, 6 additional days for painting structural steel exposed by removal of ceilings, and the elimination of 18 days for FAA's failure to lift the suspension on May 26, 1978, instead of June 13, 1978. These adjustments, which total 55 days, apportion the delays between the parties according to fault and is a reasonable allocation of their respective deficiencies. Plaintiff is entitled to a remission of $55,000; and liquidated damages assessed against plaintiff, accordingly, will be reduced to $126,000.

### 5. High Strength Bolted Connections, Temporary Heat, As Built Drawings

In the complaint, and at trial, plaintiff pursued the claims in count 4 for $57,573 to cover the cost of installing a second washer in the high strength friction bolted connections of the tower, in count 6 for $19,056 to cover the cost for temporary heat during construction because the permanent heating system plaintiff had permission to use was inadequate, and in count 9 to recover $2,888 withheld as cost to the Government to prepare "as built" construction drawings in-house after rejection of plaintiff's submissions. The findings of fact demonstrate that these claims lack merit. Plaintiff, in posttrial briefing, did not present argument

**12.** Special Contract Conditions No. 4 provides:
"4. *Liquidated Damages.* In the case of failure on the part of the contractor to complete the work within the time fixed in the contract or any extensions thereof, the contractor shall pay to the Government as fixed and agreed liquidated damages, pursuant to the clause of this contract entitled 'Termination for Default—Damages for Delay—Time Extensions' the following sums per calendar day for each day of delay in completion of the facilities set forth below:

| FACILITIES | AMOUNT PER DAY |
|---|---|
| a. Schedules II–A and I–C | $200.00 |
| b. Schedule I–A | $1000.00 |
| c. Schedules I–B and II–C | $1000.00 |
| d. Schedules I–D and II–B | $225.00 |

However, under no circumstances will the contractor be charged liquidated damages in excess of the amount of $1000.00 for each calendar day of delay in completion for Beneficial Occupancy (Substantial Completion) and all work described herein."

**13.** *Citing Sun Shipbuilding Co. v. United States,* 76 Ct.Cl. 154, 188 (1932); *Vogt Bros. Mfg. Co. v. United States,* 160 Ct.Cl. 687 (1963).

**14.** *See Commerce Int'l Co. v. United States,*

on the bolted connection claim, or the "as built" drawing claim, and they are considered abandoned. In any event, it is clear that the specifications required plaintiff to do the corrective work that was ordered on May 26, 1978, on the bolted connections. Withholding by the FAA of the cost to prepare the "as built" drawings in-house was proper. Plaintiff's submissions clearly were incomplete and unacceptable and the work was required by the contract.

Plaintiff's claim as to temporary heat, basically, is that by providing the contractor with an election to use the permanent heating system for temporary heat during construction, defendant by implication warranted that the system in fact would be satisfactory. Plaintiff argues that defendant specified alternate methods of performance, *i.e.*, permission to use the permanent heating system, or, use of its own system, such as oil-fired boilers. The terms of this contract cannot be stretched so far.[15] No warranty by implication reasonably could arise from the contract provisions cited by plaintiff.

■ The contract plainly requires plaintiff to bear the cost of temporary heat. Plaintiff's intentions to use the permanent system, even if such use were supported as a custom or practice in the trade, is not sufficient to vary the unambiguous contract language.[16]

## 6. Counterclaims

■ Defendant, under the inspection article, General Provisions, No. 10(d), has the right to charge to the contractor "any additional cost of inspection or test ... when reinspection or retest is necessitated by prior rejections." Deficiencies in the structural steel welded connections and the high strength bolted connections justified the contracts that were entered with Alaska Industrial X-Ray, Inc., and Alaska Testlabs for examination, testing, reports and certification on those subjects. Defendant has paid a total of $11,422.37 for these reports and is entitled to judgment on its counterclaims in that amount.

## CONCLUSION

Plaintiff is entitled to recover $100,476.65 on its exterior wall panel claim in count 1, and a time extension of 31 days; on its improper suspension claim in count 2, plaintiff is entitled to an adjustment for costs incurred during 18 days unreasonable suspension from May 26 to June 13, 1978; on its structural steel painting claim in count 5 and its subcontractor claim in count 7, plaintiff is entitled to recover $8,846 and a time extension of 6 days. On its claim for remission of liquidated damages in count 3, plaintiff is entitled to remission of $55,000, and the assessment against plaintiff is reduced to $126,000. Plaintiff may not recover on any of the remaining claims in its complaint, and those claims will be dismissed. Defendant is entitled to judgment of $11,422.37 on its counterclaims.

The status of payments under the contract is not clear on this record. Accordingly, counsel are directed to file, on or before March 15, 1984, a stipulation of the amount to be paid to plaintiff on the basis of this opinion. Final judgment will be entered on such amount, with interest calculated in accordance with the provisions of section 12 of the Contract Disputes Act.[17]

338 F.2d 81, 167 Ct.Cl. 529 (1964); *Vogt Bros. Mfg. Co. v. United States,* 160 Ct.Cl. 687.

**15.** Special Contract Condition No. 18(e) required plaintiff to provide as part of the contract:

"e. *Heat*—It shall be the responsibility of the Contractor to provide temporary heat, as necessary, to protect all work, materials, and equipment against injury from dampness and cold weather. . . ."

Technical Specification 15–1.12 provides:

"15–1.12 *Temporary Use of Equipment for Construction Purposes*

"15–1.12.1 *Permission required.*—The permanent equipment installation shall not be used for temporary purposes by the Contractor without express permission in writing signed by the Resident Engineer."

**16.** *Lomas & Nettleton Co. v. United States,* 1 Cl.Ct. 641, 644 (1982) and cases there cited.

**17.** 41 U.S.C. § 611 (Supp. V 1981).

Plaintiff has requested attorney fees and allowable expenses under the Equal Access to Justice Act.[18] Under the rules, USCCR 81(e), application is to be filed after entry of final judgment. In the event plaintiff files an application, defendant bears the burden of proving that its position in this proceeding was substantially justified.[19]

---

**18.** 28 U.S.C. § 2412(d) (Supp. V 1981).

**19.** *Ellis v. United States,* 711 F.2d 1571 (Fed. Cir.1983); *Gava v. United States,* 699 F.2d 1367 (Fed.Cir.1983); *Broad Avenue Laundry & Tailoring v. United States,* 693 F.2d 1387 (Fed.Cir. 1982).