**KORDICK AND SON, INC. and Steve P. Rados, Inc., a Joint Venture**

v.

**The UNITED STATES.**

No. 31–85C.

United States Claims Court.

June 29, 1987.

James M. Radnich, Los Angeles, Cal., for plaintiff.

Terrence S. Hartman, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

MARGOLIS, Judge.

Plaintiff Kordick and Son, Inc. and Steve P. Rados, Inc., a joint venture (Kordick), challenges the final decision of the contracting officer of the United States Department of the Interior, Bureau of Reclamation, finding it responsible for payment of repairs to two flexible insulated couplings which leaked when the pipeline constructed by Kordick was filled with water within the contract warranty period. Plaintiff was held responsible for $97,476.44, which includes the cost of excavation and repair of the couplings, supplies, and a 15% "administrative and general expense" sum ($12,714.32). The government counterclaimed for the amount of the contracting officer's decision, plus interest. A three-day trial was held in Pasadena, California. After review of the entire record, the court finds for the plaintiff in part, and the defendant in part.

## FACTS

Defendant United States, through the Department of the Interior, Bureau of Reclamation, entered into a contract with Kordick and Son, Inc. and Steve P. Rados, Inc., California corporations comprising a joint venture. The contract, number 7-07-DC-07284, dated September 27, 1977, covered construction and completion of the Main Aqueduct "B" Line, Southern Nevada Water Project, Second Stage, Station 56 + 30.-13 to Station 186 + 52.82. This contract required the furnishing and laying of pipes with diameters ranging from approximately 86 to 114 inches and constructing structures for about 2.3 miles of pipeline to transport water for municipal and industrial use. The work was performed about six miles north of Boulder City, Nevada. The estimated contract price was $3,216,283. Notice to proceed was received by the plaintiff on September 29, 1977.

At issue in this case are two flexible insulated couplings which were located at the upstream and downstream sides of existing "Surge Tank 2," which leaked when the aqueduct was first filled with water in October, 1981. Existing Surge Tank 2 was

located at the top of a steep hill; the inlet and outlet lines were at approximately 30 percent slopes. The purpose of a surge tank is to allow the escape of air and turbulence induced in a large diameter pipeline in order to prevent damage to the pipeline itself.

Contract Specifications § 3.1.2., Pipe Options, permitted the plaintiff to choose the type of pipe it would furnish from four alternatives; plaintiff selected embedded cylinder prestressed concrete pipe (line pipe). Section 3.1.5.a. required that the contractor "furnish and install a cathodic protection and monitoring system for ... embedded cylinder prestressed concrete pipe alternatives." This section further provided that "[e]lectrical isolation in the form of *either flexible or rigid* insulating fittings ... shall be provided as required to obtain electrical discontinuity at: (a) Joints where line-pipe alternatives containing a steel cylinder are joined to steel pipe." Section 3.1.5.b.(4)(a) (emphasis added). Plaintiff's choice of line pipe contained a steel cylinder and was approximately 114 inches in diameter.

Plaintiff's drawings and specifications for its proposed corrosion monitoring system failed to show the locations of insulating fittings required by § 3.1.5.b.(4)(a), *i.e.*, where line pipe alternatives containing a steel cylinder were joined to steel pipe. Defendant informed the plaintiff of this deficiency by letter in late March, 1978. This letter also specified the Station locations where the insulated fittings were required; the locations at the upstream and downstream sides of Surge Tank 2 were identified as Station 150 + 32.20 and Station 150 + 93.02. This first station number apparently was incorrect on plaintiff's shop drawing; the correct station number was 150 + 32.71. Each full station number reflects a horizontal distance of 100 feet; therefore, the difference between Stations 150 + 32.20 and 150 + 32.71 is roughly .51 foot—about six inches. The "stub-outs" from Surge Tank 2 were approximately 86 inches in diameter; for this reason it was necessary to have sections of steel pipe (called "steel specials" by the plaintiff) connecting the much larger line pipe to the existing surge tank. This fact called the insulating coupling requirements of § 3.1.-5.b.(4)(a) into play. On this type of project, pipe is laid starting at the bottom of the hill working toward the top; if pipe was laid first at the top of the hill it would slide down the hill and make proper alignment and fastening virtually impossible.

Plaintiff submitted revised drawings in April, 1978 which showed insulated couplings; the defendant responded to plaintiff in mid-May, 1978 that the drawings continued to fail to identify the type of insulated fittings proposed for use as required by § 3.1.5.b.(4)(a). Plaintiff remained of the opinion, based on pre-bid inquiries and the fact that the contract drawings did not show or depict insulated couplings, that insulated couplings were not required. Plaintiff, therefore, requested additional compensation for the couplings. This request was denied at the end of May, 1978, and was the subject of a separate challenge and contracting officer's decision not at issue here. Contract General Provisions (Standard Form 23–A) Section 2., Specifications and Drawings, states in part that "[a]nything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern." Insulated couplings were therefore required at Stations 150 + 32.71 and 150 + 93.02, between the line pipe and steel specials.

Plaintiff's witnesses testified in great detail why it was not possible to place flexible insulated couplings at the specified locations. Flexible couplings require that both ends of the pipes to be joined are the same diameter; the outside diameter of the plaintiff's chosen type of line pipe was approximately 114 inches and that of the steel specials was 98 inches. Apart from conclusory opinion testimony, the evidence was inconclusive as to whether it would have been possible to place rigid insulating couplings at the specified locations. However, the choice of type of coupling was left to

the contractor by Specifications § 3.1.5.-b.(4). There is also no indication the plaintiff brought to the attention of the defendant that using insulating couplings would require redesign of the joints at the specified locations.

Plaintiff elected to provide flexible insulated couplings. If flexible couplings were chosen, the specifications required use of Dresser Style 39 Insulating Couplings or approved equal. Section 3.1.5.b.(5). In mid-June, 1978, plaintiff requested that Baker Series 216 flexible insulated coupling be approved as the equal of the Dresser coupling. The plaintiff submitted a Baker company drawing to the Project Construction Engineer requesting this approval. The Baker drawing indicated that couplings of approximately 86–inch diameter had been ordered by the plaintiff. In early July, 1978 the defendant approved the Baker coupling as the equal of the specified Dresser coupling.

The only points near Surge Tank 2 where two pipe sections of 86–inch outside diameter existed were Stations 150 + 51.40 and 150 + 72.14, both approximately 40 feet away from the locations specified for the insulated couplings. Because an "equation" was used to avoid the necessity of renumbering all stations after the final pipeline alignment, Stations 150 + 32.71 and 150 + 72.14 were on one side of Surge Tank 2; Stations 150 + 51.40 and 150 + 93.02 were on the opposite side. Plaintiff installed the Baker couplings at Stations 150 + 51.40 and 150 + 72.14 beginning on July 11, 1978. Considering the fact that the pipe was being laid from the bottom of the hill to the top, it is likely that when the plaintiff received approval for the Baker couplings and began their installation, the joints at Stations 150 + 32.71 and 150 + 93.02 had been completed without the insulated couplings required by the specifications. Despite allegations to the contrary by the plaintiff, no evidence was presented that the defendant had issued a change to the specifications allowing the insulated couplings to be moved from the specified stations to those where plaintiff installed the couplings; in fact, the plaintiff acknowledged at trial that it was "still wait-ing" for this approval. Tr. 699. Plaintiff's expert witness testified that placing the couplings at the locations close to the surge tank, between two steel pipes with different coatings, would not provide the desired corrosion protection.

The installation instructions for the Baker couplings state in part:

PIPE ENDS:

1. Measure pipe diameter at 8 places 45 Deg. apart. Difference between minimun [sic] and maximum should not exceed ¼″. If the difference is greater than ¼″, make corrections by rounding the pipe with trench jacks or suitable wooden posts and wedges.

Maintain this roundness until the joint is made up.

2. Pipe ends must be clean and free of all oil, dirt, loose scale, rust. A thorough cleaning with wire brush should be done.

ASSEMBLY:

\* \* \* \* \* \*

2. The gaskets should be cleaned and inspected ... and then stretched over the pipe ends. It may be found helpful to wet the gaskets with water to make installation easier.

\* \* \* \* \* \*

4. IMPORTANT. The clearance between the outside of the pipe, [sic] ends and the inside of the middle ring is to be distributed as evenly as possible. No more than ⅛″ opening at one place is permissible....

5. Be sure that the gasket pocket in the follower is free from wood, dirt, metal, and other field debris.

\* \* \* \* \* \*

BOLTING UP:

\* \* \* \* \* \*

3. On couplings 60′ [sic] and larger, 3 or 4 men can best tighten. Space the men equally around the coupling, and have them all advance in the same direction as they tighten each nut.... Use a torque-limiting wrench (Pronto Wrench or equal), and tighten to 30–35 feet-pounds [sic] all around, two or three times. In-

crease wrench setting to 40–50 foot-pounds, and continue to tighten to 75 foot-pounds for ⅝″ bolts or 90 foot-pounds for ¾″ bolts. At the maximum tightness, go around the coupling several times to make sure that all bolts are tight.

\*　　\*　　\*　　\*　　\*　　\*

RETIGHTENING OF BOLTS:

1. After 24 hours, retighten bolts, ⅝″ bolts retighten to 75 foot-pounds, ¾″ bolts to 90 foot-pounds.
2. After 72 hours, retighten bolts as above.
3. After 4–5 days, the bolts should be checked and retightened as necessary in step 1 above.

\*　　\*　　\*　　\*　　\*　　\*

PIPE END PREPARATION: ... All out-of-roundness shall be in the form of a smooth oval that can be jacked round in such a manner that the difference between the maximum and minimum diameters shall not exceed ¼″.

Some daily reports prepared by the government inspector during the time of installation of the couplings at the Surge Tank 2 location, mid-July to mid-August, 1978, indicated that "rocks and gravel" were found between the gasket and coupling middle ring and pipe section. This report was confirmed by testimony at trial. The inspector testified that plaintiff did not follow the Baker coupling instructions on this subject and many others; plaintiff disputed these conclusions. The inspector's report also indicated that the gaskets were tight and seating was difficult due to pipe out-of-roundness. At the trial, the defendant's expert acknowledged that it would not have been possible to place the coupling on the pipe ends if a severe out-of-roundness had been present. The inspector also testified that proper torquing procedure of the bolts was not followed; plaintiff did not dispute this. In particular, plaintiff admitted at trial that the bolts were retorqued only once. The court concludes from this evidence that even if these couplings had been placed at the specified locations (ignoring for this purpose that it may not have been possible to place the flexible couplings at the specified locations), the workmanship, at a minimum, called into question whether the specifications had been met.

Plaintiff's expert witness testified that the cause of the failure of the coupling at Station 150 + 72.14 was "shear" caused by differential settlement of the pipe and the surge tank; flexible couplings cannot tolerate shear forces. The surge tank had been constructed long before the construction of the pipeline and was constructed on bedrock and therefore could not settle; plaintiff's expert testified that the pipe settled at the time it was backfilled (covered), and this caused the failure. Defendant disputed this claim, and produced evidence that a mortar coating of the joint showed at most a hairline crack, and that if differential settlement had occurred the mortar would have been severely cracked. Plaintiff explained that the settlement took place during backfill—*prior* to the mortaring of the joint; mortaring was the last step in the process. Placement of the couplings at Stations 150 + 51.40 and 150 + 72.14, very close to the existing Surge Tank 2 at the top of the hill, rather than at the specified locations, however, was plaintiff's "field change," and even finding that the location itself caused the failure does not assist plaintiff's claim. In addition, a question is raised whether the pipe was given adequate support during backfill.

The contract was substantially completed on November 27, 1978. Specifications § 3.1.4., Maintenance Warranty of Pipelines, provided in part that

[f]or a maintenance warranty period of 3 years after the pipeline is filled with water or 5 years after acceptance of the work, whichever comes first, the contractor shall be responsible for the repair of all defects, leaks, or failures occurring in the pipe, pipe joints, valves and steel pipe from any cause whatsoever, except for such leaks, defects, or failures which are, as determined by the contracting officer, due to negligence in the operation of the pipeline system by the Government or its agents, acts of third parties, acts of God, or acts of the common enemy.

In mid-May, 1979, the dates for the warranty were provided to the contractor. The pipeline had not been filled with water at that time, so the three-year period could not be determined; the five-year period began to run on November 27, 1978, the date of acceptance. The plaintiff was informed, therefore, that if the pipeline was filled with water prior to November 27, 1980, the three-year warranty period would be established and would supersede the five-year warranty period. This event did not happen.

On Friday, October 2, 1981, the Main Aqueduct "B" Line was filled with water, within the five-year warranty period. On Saturday, October 3, 1981, the line was found to be leaking on the upstream side of Surge Tank 2, at Station 150 + 72.14. Plaintiff was informed of the leak on October 4, 1981. Plaintiff requested that a contractor then at the site be contacted to provide the excavation of the leak site. This was done, and the Baker coupling was found to be leaking. On October 12, 1981, a representative of the plaintiff contacted the defendant and stated that, because plaintiff believed that the leak was not its responsibility, it would take no action to repair the leak. The defendant therefore issued a purchase order to another contractor to clean and reassemble the coupling. On November 25, 1981, the line was refilled to check for leaks; the coupling began to leak again, as did the coupling at the downstream side of the surge tank at Station 150 + 51.40. On January 5, 1982, the defendant entered into a contract with Tab Construction, Inc. to reinstall the Baker couplings on both sides of Surge Tank 2. The couplings were reinstalled under the supervision of a Baker Company representative and have performed in a satisfactory manner since that time.

Plaintiff claims that the reason for the satisfactory performance after reinstallation is that any differential settlement had already taken place, allowing a firm seal to be achieved. Even assuming this to be correct, there is evidence in the record that the Baker coupling installation instructions were scrupulously followed at the reinstallation, which was not the case during the original installation.

Defendant appears to believe that plaintiff's refusal to return to the site and perform the repairs is critical to this case. Specification § 3.1.4., however, provides that if the contractor

> fails or refuses to make required repairs or replacements with due promptness and diligence as determined by the contracting officer, the Government shall have the right to make repairs and replacements and, unless it is determined that the costs of such work is chargeable to the Government, the entire costs thereof shall be paid by the contractor.

The specifications, therefore, contemplate exactly the situation in this case. If the cost of such work was not chargeable to the defendant because of its negligent operation of the pipeline, or acts of third parties, God, or the common enemy, the plaintiff was responsible for the cost.

Defendant claims the following costs to repair the couplings:

| | |
|---|---|
| Peter Kiewit Sons' Company | $ 5,351.85 |
| Southern Nevada Water System | 1,809.09 |
| Nevada Nut and Bolt, Inc. | 88.27 |
| TAB Construction, Inc. | 77,512.91 |
| Government Administrative and General Expense (15%) | 12,714.32 |
| Total | $97,476.44 |

Plaintiff agrees that all charges were reasonable except the Administrative and General Expense amount of $12,714.32, which it claims was not warranted based on the language of the specifications.

Defendant claims that the responsibility for the coupling failures was the plaintiff's poor workmanship and failure to follow exactly the installation instructions for the couplings, and that plaintiff is responsible for its breach of warranty. Defendant also claims that its administrative costs are part of the "entire" costs to repair the couplings, and therefore the plaintiff is responsible for the full amount. Plaintiff claims that the cause of the failure of the couplings was the defendant's defective specifications, that the warranty provision of the specifications does not insulate the defendant from the consequences of its defective specifications, and that plaintiff there-

fore is not liable for any costs to repair the couplings. In any event, the plaintiff claims that it should not be responsible for defendant's alleged administrative costs.

Plaintiff challenged the determination of its liability to the contracting officer; the contracting officer's final decision finding liability in the full amount claimed by the government was issued on March 16, 1984. Plaintiff filed suit in this court on January 18, 1985 challenging the contracting officer's final decision. Jurisdiction is proper in this court under 41 U.S.C. § 609(a)(1).

## DISCUSSION

### I. *Breach of Warranty*

■ The traditional government warranty clause gives the government a remedy for patent defects discovered after acceptance of the work; the warranty clause serves to overcome the finality of acceptance. Because of this drastic result, warranty clauses are strictly and narrowly construed against the government. *Joseph Penner*, GSBCA No. 4647, 80–2 B.C.A. (CCH) ¶ 14,604 at 72,019 (1980). The clause at issue here required a warranty of the pipeline and its components from all defects, leaks or failures from "any cause whatsoever" within the warranty period, except for specifically enumerated exceptions. Failure to install the couplings at the specified locations and defective workmanship in installation fall within the contemplation of the warranty clause.

■ In order to recover under a warranty clause, the government must show that the contractor was given notice of the defect and prove the existence of a defect within the contractor's control. *Vi-Mil, Inc.*, ASBCA No. 16,820, 75–2 B.C.A. (CCH) ¶ 11,435 at 54,482 (1975). *See* J. Cibinic & R. Nash, *Administration of Government Contracts*, 622–25 (2d ed. 1985). Notice was given to plaintiff here within one day of the discovery of the leak; plaintiff was given the opportunity to undertake the repair of the couplings. The defendant has demonstrated that it is likely that the leak was the result of the improper installation by the plaintiff; the coupling installation

instructions were not strictly observed. In addition, the plaintiff itself demonstrated that another probable cause of the failure was the placement of the couplings at locations of its choice which were not specified by the government. Plaintiff is thus liable for breach of warranty.

■ In accordance with the tendency to construe warranty clauses strictly and literally, the government is limited to the remedies enumerated in the clause itself. *See* J. Cibinic & R. Nash, *supra*, at 625–28. The government may not obtain a warranty remedy not specifically mentioned in the warranty clause. *O.F. Paulson Construction Co.*, VACAB No. 1214, 79–1 B.C.A. (CCH) ¶ 13,623 at 66,816 (1978). This policy has an impact on the damages claimed by the defendant for repair of the couplings, which is discussed below.

### II. *Defective Specifications*

After it is demonstrated that the most likely cause of the failure was the contractor's design, material, or workmanship, the contractor must come forward with proof that it had no responsibility for these items under the contract or that defects did not exist. *George E. Jensen Contractor, Inc.*, ASBCA No. 23,284, 81–2 B.C.A. (CCH) ¶ 15,207 at 75,296 (1981).

It is well accepted that the government is responsible for its specifications; the government warrants that conformance with its specifications will result in satisfactory completion of the work. The government is liable when its specifications create problems which a contractor could not reasonably foresee. *United States v. Spearin*, 248 U.S. 132, 137, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918); *John McShain, Inc. v. United States*, 188 Ct.Cl. 830, 833, 412 F.2d 1281, 1283 (1969); *Wunderlich Contracting Company v. United States*, 173 Ct.Cl. 180, 191, 351 F.2d 956, 964 (1965); *Toombs and Company, Inc. v. United States*, 4 Cl.Ct. 535, 547 (1984). In "design" specifications, the government sets forth in precise detail the materials and the methods to be used to complete the work; no deviation is permitted. In "performance" specifications, an objective or standard of perform-

ance is set forth, and the contractor has discretion to formulate its own method of performance to achieve successful contract completion. The government is responsible only for design specifications. *J.L. Simmons Company v. United States*, 188 Ct.Cl. 684, 689–91, 412 F.2d 1360, 1362–63 (1969). Where a design specification is involved, the plaintiff must demonstrate that substantial compliance with the specifications still resulted in an unsatisfactory result. *Toombs*, 4 Cl.Ct. at 547.

In this case, the specifications can be described as a composite of design and performance aspects. Plaintiff was allowed its discretion both in the type of line pipe to be used and in the type of insulated coupling to be used. Even characterizing the specifications as "design" does not assist the plaintiff, as it has not demonstrated that it substantially complied with the specifications; the couplings were not placed at the specified locations 150 + 32.-71 and 150 + 93.02, and the installation instructions were not followed.

Plaintiff claims that when defendant reviewed its request for approval of the Baker flexible couplings as equal to the specified Dresser couplings it was put on notice that plaintiff had ordered 86–inch diameter couplings, and that therefore the locations where the couplings would be installed were identified by the coupling size. Plaintiff further claims that the approval of the Baker couplings as equal to Dresser couplings constituted approval of the installation at Stations 150 + 51.40 and 150 + 72.-14 and was a change to the specifications. Plaintiff therefore claims that it did, in fact, comply with defendant's design. Plaintiff's expert witness testified that installation of the insulating coupling between two sections of steel pipe with different coatings would not provide the desired corrosion protection. It is unlikely, therefore, that the approval of the Baker coupling as equal to the Dresser coupling, even if the defendant was well aware of the size discrepancy, could constitute a change to the specifications considering that it resulted in negating the desired corrosion protection.

■ Plaintiff claims, as well, that the defendant approved a shop drawing made by its supplier, Conduit Fabricators, Inc., which showed bell and spigot joints rather than insulated couplings at Stations 150 + 32.71 and 150 + 93.02. Plaintiff presented no evidence that it brought to the attention of the government that these drawings deviated from the specifications as required by Contract General Provisions (Standard Form 23–A) Section 15., Shop Drawings. This drawing, however, also showed butt straps at Stations 150 + 72.14 and 150 + 51.40, where plaintiff actually installed the insulated couplings. Therefore, even had this drawing been properly "approved," plaintiff did not comply with it during construction. Also, the government's alleged "approval" of plaintiff's shop drawing was made on January 11, 1980, over one year after the project was completed, and stated merely that the requirement of Specifications § 6.1.1., calling for document submittal, had been completed. In addition, the plaintiff acknowledged at trial that it is "still waiting" for the government's approval of the change in location of the insulated couplings. These facts do not support the conclusion that the defendant issued a change to the specifications and that the plaintiff complied with the changed specifications. Plaintiff at most received tacit approval of its "field change" for location of the couplings; it did not obtain a change to the specifications. *See, e.g., Community Science Technology Corp.*, ASBCA No. 20,244, 77–1 B.C.A. (CCH) ¶ 12,352 at 59,776 (1977) (erroneous approval of shop drawings containing nonconforming work does not bind government to accept such work where deviations not brought to the attention of the government).

■ Even if the court found that the government had issued a modified specification, the plaintiff could not prevail. Where a contractor shows that, although it substantially complied with government specifications, the result was unsatisfactory, the government may nevertheless prevail if it can provide proof that defective materials, defective workmanship, or some

other cause within the contractor's control produced the unsatisfactory result. *R.E. D.M. Corporation v. United States*, 192 Ct.Cl. 891, 900, 428 F.2d 1304, 1309 (1970); *Toombs*, 4 Cl.Ct. at 547–48. There was sufficient evidence in this case to support the conclusion that defective workmanship existed in the installation of the couplings.

### III. *Administrative and General Expense*

Because the government is limited in its damages to those enumerated in the warranty clause, the clause and the specifications in general must be consulted for a determination of whether the government may collect from the plaintiff a 15% "administrative and general expense" amount to cover the government's own "overhead" expenses.

Specifications § 3.1.4., Maintenance Warranty of Pipelines, provides in part that

[t]he contractor will be reimbursed the actual and necessary cost, *plus 15 percent* for profit and general expense of any work or materials pertaining to repairs or replacements that are determined as not the responsibility of the contractor.

   \*     \*     \*     \*     \*     \*

If the contractor fails or refuses to make required repairs or replacements with due promptness and diligence ..., the Government shall have the right to make repairs and replacements and ... the *entire* costs thereof shall be paid by the contractor and may be collected from the contractor or the contractor's surety or sureties or both.

(emphasis added).

■ Defendant argues that the provision in the warranty clause of payment to the government by the contractor of the "entire" costs of any necessary repairs includes the government's overhead. The clause must be strictly construed in its entirety, using the plain meaning of words and so as to make no provision meaningless. *Systems Exploration, Inc. v. United States*, 8 Cl.Ct. 334, 337 (1985). Strictly construing the language of the warranty clause itself, interpretation of the term "en-

tire" must mean the amount actually paid by the government to the contractors who performed the repair work. If "entire" were determined to include 15 percent administrative and general costs, the specific provision in the warranty clause for payment of 15 percent for profit and general expense to contractors would be rendered meaningless. If the government intended the 15 percent to apply to both contractors and the government it could have drafted the warranty clause of the specifications to so indicate.

Specifications § 1.3.5., Backcharges to Contractor, specifies that "[w]here these specifications provide for charges to the contractor for costs incurred by the Government ..., such charges will include the costs ... *plus 15 percent of such total costs for Government overhead.*" (emphasis added). This specification clause would appear to allow defendant's recovery of 15 percent for administrative and general expense; defendant acknowledged that it is this contract provision which is relied on for the charge. Because the warranty clause serves to override the finality of acceptance, as discussed above, however, and because the language of the warranty clause itself, including its remedies, must be strictly construed, the language of other clauses of the specifications cannot override the language of the warranty clause. *See, e.g., Tracor Data Systems*, GSBCA No. 4662, 78–1 B.C.A. (CCH) ¶ 13,143 at 64,259 (1978) ("the Government may not look outside the [warranty] clause for other remedies for breach of express warranty").

For this reason, the Administrative and General Expense amount of $12,714.32 is not supported, and the contracting officer's decision is reversed to that extent.

### IV. *Interest*

■ Plaintiff claims that the government is not entitled to interest on amounts found due it under the Contract Disputes Act, 41 U.S.C. § 611, which provides for interest only on amounts due contractors by the government. Awards of interest to the government are discretionary with this

court. *Astro-Space Laboratories, Inc. v. United States,* 200 Ct.Cl. 282, 312, 470 F.2d 1003, 1020 (1972). Because plaintiff is responsible for the actual cost to repair the couplings, and has had the use of those funds, it would be inequitable to deny interest to the government in the circumstances of this case. The court thus exercises its discretion to award interest to the defendant.

## CONCLUSION

The evidence shows that the installation of the insulated couplings on both sides of Surge Tank 2 was defective both because the couplings were not installed at the specified locations but rather at Stations $150 + 51.40$ and $150 + 72.14$, which allowed differential settlement to breach the seal, and because the coupling installation instructions were not followed. For these reasons the plaintiff's challenge to the contracting officer's final decision is denied insofar as it concerns amounts actually paid to the contractors performing the repair work. The defendant's counterclaim is granted in the amount of $84,762.12, plus interest computed as specified in the Contract Disputes Act, 41 U.S.C. § 611, to run from March 16, 1984. The Administrative and General Expense amount is not supported by the language of the warranty clause itself, and the plaintiff's challenge to the contracting officer's decision is sustained in the amount of $12,714.32; the plaintiff is not indebted to the defendant in that amount. The clerk will dismiss the complaint and enter judgment for the defendant on its counterclaim as specified above. Each party is to bear its own costs.