SPANDOME CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 551–89C.

United States Court of Federal Claims.

Jan. 23, 1995.

William M. Jeter, Memphis, TN, attorney of record, for plaintiff.

John E. Kosloske, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant. David M. Cohen, Director, of counsel.

## OPINION

FUTEY, Judge.

This contract case is before the court after a trial on the merits. Plaintiff contracted with defendant for the construction of a relocatable, tensioned fabric structure. One year after final acceptance of the finished structure, one part of the building collapsed. Defendant invoked the Warranty Clause stating that the collapse was caused by a latent defect, and requested plaintiff repair the structure. Plaintiff disagreed, stating that tornadic like winds caused the collapse. Plaintiff agreed to repair the dome, but only at additional cost to defendant. Defendant terminated plaintiff's contract for default and removed the entire structure, offsetting part of the cost from a separate contract with plaintiff.[1] Plaintiff alleges that its contract was improperly terminated for default, but defendant counters that the termination was proper and seeks reimbursement for the cost of the contract, plus additional expenses.

### Factual Background

On March 27, 1986, defendant, the Department of Defense, Defense Logistics Agency (DLA), Defense Industrial Plant Equipment Center (DIPEC) issued Solicitation No. DLA002–86–003, inviting fixed-price bids for the supply and erection of two relocatable, tensioned fabric structures of at least 24,000 square feet each or, alternatively, one relocatable, tensioned fabric structure of at least 55,000 square feet. The structure was intended to protect 55–gallon containers of haz-

---

1. Although plaintiff originally questioned the propriety of the offset, the parties were assumed to have come to an understanding during a pretrial conference. In any event, the court finds that any questions regarding the administrative offset were rendered moot by the decision of the Federal Circuit in *Cecile Indus., Inc. v. Cheney,* 995 F.2d 1052 (Fed.Cir.1993).

ardous and flammable liquids stored at the Defense Depot Memphis, Tennessee (DDMT).

Plaintiff, Spandome, submitted a proposal to supply a single roof structure covering 55,332 square feet. The structure was to consist of two domes, adjacent to one another and connected by a strip of fabric called the "valley." The structure was designed by the president of Spandome, Mr. Arpad Kolosvary. Although he had vast experience in designing single dome structures, Mr. Kolosvary testified at trial that he never designed and erected a tensioned fabric structure consisting of two domes with a connecting valley between them.[2]

Defendant awarded the contract to Spandome on April 21, 1986. Spandome erected a two-dome fabric structure at the DDMT, completing it by July 22, 1986. Final inspection was completed and the project was finally accepted on the same day.[3]

A snow storm on January 6 & 7, 1988, deposited snow in the valley of the Spandome structure (Spandome I) at a depth of approximately two feet.[4] The snow melted and accumulated in the valley center with no outlet or drainage. As a result, the fabric in the valley stretched and weakened. Another heavy rainfall on the morning of January 19, 1988, caused more water to collect in the stretched pocket of the fabric.

Evidently the government was aware that Spandome I was in a weakened state. On the morning of January 19, 1988, representatives of the government, Mr. Gray and Mr. Spurlock, went to observe the dome. Specifically, Mr. Gray testified that he was asked by his supervisor to "go out and see if the Spandome is still standing."[5] The men arrived at the site of the structure sometime between 7:20 and 7:45 a.m. They testified that it was raining, but they did not notice any wind.[6] The men did notice a bulge sinking down in the center of the valley, apparently the water accumulated in the valley and caused the fabric to sag.[7] The men also testified that there was no tension in the valley cables.[8]

At approximately 8:00 a.m. on January 19, 1988, the north dome of Spandome I collapsed. Defendant's witness, James A. Jackson, a National Weather Service official, indicated that 1.55 inches of rain fell on the morning of January 19, 1988 (before the 8:00 a.m. collapse). Defendant further states the weather data provided that winds that day were moderate, averaging about 15 miles per hour (m.p.h.) with maximum wind gusts of 30 miles per hour. Defendant maintains that there was no mention of a tornado in this weather data.

Coincidentally, on the morning of the collapse, Mr. Kolosvary, the President of Spandome, was en route to the site in order to inspect the structure where the water and snow had accumulated. After arriving to find the collapsed structure, defendant's representatives advised plaintiff to call an independent firm to assess the situation. Plaintiff selected a local Memphis engineering firm, The Pickering Firm, to examine the structure. The chief branch engineer of that firm concluded after investigation that "wind forces much greater than the building code required for design of the structures ... triggered the collapse."[9]

Plaintiff maintains that strong winds and heavy rain prevailed in the early morning hours, just prior to the collapse. Plaintiff states that a tornado watch was in effect in the Memphis and Shelby County area, and

---

2. Transcript (Tr.) 618(9–12); 624(9–15); 626(4–5).

3. On December 8, 1986, the government and Spandome executed another contract DLA002–87–R–003 which paid $66,575 for the supply and installation of an awning for the Spandome I structure. Because the awning became useless after the collapse, defendant is also seeking reimbursement on this contract.

4. Tr. 30(6–7).

5. Tr. 33(16–20).

6. Tr. 33(14–25)–34(1–3) (Gray); 73(14–17) (Spurlock); Tr. 36(18–25)–37(1–2) (Gray); 73(14–20) Spurlock.

7. Tr. 37(11–14).

8. Tr. 40(24–25)–76(1–2) (Spurlock); 62(3–7) (Gray).

9. Tr. 717(13–18).

was upgraded to a tornado warning at or about the time of the collapse. Plaintiff maintains that the collapsed structure showed evidence that it was hit by a tornado.

On February 1, 1988, the Contracting Officer (CO) invoked the Warranty Clause of the contract claiming that there was a latent defect in the structure, and requested that Spandome submit a plan of corrective action toward restoration of the structure in accordance with contract requirements. On February 15, 1988, plaintiff sent a letter protesting the invocation of the warranty. Defendant maintains that Spandome did not offer any plan of correction in that letter.

On February 29, 1988, the CO sent plaintiff a cure notice. Plaintiff responded on March 18, 1988, enclosing a statement which alleged that a tornado had hit the structure causing it to collapse. Additionally, plaintiff requested the government specify latent defects in the structure's design.

On March 25, 1988, defendant revoked acceptance of Spandome I based on the existence of a latent defect, and executed a partial default termination. Defendant informed plaintiff that a final determination had not been made as to whether it's failure to perform was excusable, but that a final determination would be made after receipt of the engineering report on the cause of the collapse.

Defendant prepared two final engineering reports, a Forensic Study of Tensioned Fabric Structure at DDMT prepared by Garver & Garver, P.A., and Evaluation of the Collapse of the Tensioned Membrane Fabric Structure at DDMT, prepared by the Department of the Army, Construction Engineering Research Laboratory (CERL). Both reports concluded that design defects caused the failure of the double-domed Spandome I structure. Preliminary reports made by both Garver & Garver and CERL also stated that design defects caused the collapse. On July 6, 1988, plaintiff objected to the government's course of action, disagreeing with the findings of both reports.

By final decision of October 6, 1988, based on physical evidence, witness reports, and technical findings, the CO found that plaintiff's failure to perform its contract did not arise out of causes beyond its control or without its fault or negligence.

On February 13, 1989, the CO issued a final decision which determined total, non-excusable default termination, invoked final revocation of acceptance, and elected to demand dismantling/removal of Spandome I from the Depot. The CO assessed damages against plaintiff in the amount of $525,013, based on plaintiff's failure to properly perform the contract. Both the contractor and the government exchanged correspondence regarding dismantling the remaining dome. It appears the parties were attempting to negotiate a removal plan; however, on May 25, 1989, defendant contacted plaintiff by both mail and phone, advising that the remaining dome was to be dismantled by May 26, 1989. Plaintiff was unable to respond in the 24 hour period allotted, and the government removed the remaining dome on May 26, 1989.

Defendant maintains that the defects existing in the structure were not discernable upon reasonable inspection. Thus, defendant believes that it was justified in its revocation of acceptance pursuant to FAR 52.246–2 (Inspection of supplies-fixed price). Further, defendant believes it properly invoked FAR 52.249–8 (Default) which was incorporated by reference into both the contract for the structure and the awning. Defendant avers that plaintiff failed to demonstrate that its failure to perform the contract arose from the causes beyond its control and without fault or negligence.

*Discussion*

I. *The Collapse*

On January 19, 1988, at approximately 8:00 a.m., the north dome of Spandome I collapsed. The only eyewitness to the collapse presented at trial was Mr. Charles Wallis. Mr. Wallis, DDMT's Chief Fire Inspector, was driving to Spandome I at that time to check the drain pipes.[10] Mr. Wallis testified that he was 100 to 150 yards from

10. Tr. 94(4–19).

Spandome I when it collapsed.[11] Mr. Wallis stated that the southwest corner of the north dome appeared to fall first, followed by the remainder of the dome.[12] Mr. Wallis also testified that the weather he observed at the time of the collapse was light to moderate rain, but he did not view any wind or any condition associated with tornadic activity.[13]

Mr. Kolosvary, however, testified that the winds were so strong that his flight into Memphis was delayed from landing that morning.[14] Plaintiff maintains that winds exceeding 100 m.p.h. were responsible for the collapse of Spandome I at the Defense Depot on January 19, 1988. To support its theory, plaintiff presented the testimony of Mr. Jack Scott of the Pickering Firm. Plaintiff hired Mr. Scott immediately after the collapse to determine the cause of the failure. Mr. Scott testified to the location and condition he found the structure, and concluded that "a large upward force" had caused the damage to the cables and tripods, which ultimately led to the collapse.

To refute plaintiff's theory that a tornadic wind was the cause of the failure, defendant's witness, Mr. James Jackson from the National Weather Service, objectively interpreted documented data on the weather patterns of January 19, 1988. In his testimony, Mr. Jackson examined all available data, but he could find no sign of tornadic activity on or near the Depot on January 19, 1988, around 8:00 a.m. On cross examination, the most favorable testimony plaintiff could evoke from Mr. Jackson was the fact that there were reports of tornados touching down that day in neighboring counties. There was no evidence, however, that any tornado, or even strong winds, touched down in Shelby County where the Depot is located.

Based on the testimony of Mr. Jackson and the documentary evidence, the court finds that the collapse of the north section of Spandome I was not due to tornadic activity. The overwhelming objective evidence can lead to no other result. Although the court acknowledges many instances of severe weather, such as the unusual amount of snowfall recorded earlier that month, or even the impressive amount of rain that fell the morning of the collapse, there is simply insufficient evidence that winds greater than 100 m.p.h. caused the failure. Mr. Kolosvary's testimony that his flight was delayed in landing provides the court with little information. Instead the reliable records of the weather service and the independent impartial testimony of Mr. Jackson convinced the court that a tornado or tornado like winds were not responsible for the failure.

## II. Latent Defect

Defendant claims that the collapse was a result of latent defects. In order to negate the effect of final acceptance, the government must first establish the existence of a defect. *United Technologies Corp. v. United States*, 27 Fed.Cl. 393, 398 (1992). A latent defect is one that would not have been discovered by reasonable inspection. *Kaminer Construction Corp. v. United States*, 203 Ct.Cl. 182, 191, 488 F.2d 980 (1973). In order to revoke acceptance of the supply, the government must assert its claim in a timely manner, and prove by a preponderance of the evidence that a latent defect existed at the time of final acceptance which was hidden from knowledge as well as sight, and could not be discovered by the exercise of reasonable care. *United Technologies*, 27 Fed.Cl. at 398. Defendant claims that the inspection in this case was reasonable, and could not have revealed the latent defects in Spandome I. Defendant believes that government reliance on Spandome's expertise in fabric tensioning structure design led them into entering a fixed-price contract, and that plaintiff should therefore bear the risk of design defects. *See e.g., United Technologies*, at 400–01. The contract must provide for post-acceptance recovery. *United Technologies*, 27 Fed.Cl. at 399–400. Inclusion of the standard Inspection Clause allowing defendant to set aside final acceptance based on "latent defects, fraud, or such gross mistakes

---

11. Tr. 99(10–15); 108(9–18).

12. Tr. 100(5–10).

13. Tr. 97(1–5), 101(3–11).

14. Tr. 578(2–14).

as amount to fraud" satisfies this requirement. *Id.* at 400.

To support its theory that a latent defect was responsible for the collapse, defendant presented the expert testimony of Mr. Chris Anastos. Mr. Anastos is a licensed structural and civil engineer. He was employed between 1978 and 1984, by a firm which specialized in tension fabric structures, where he gained experience erecting these structures. Mr. Anastos continued building these structures until 1990.

Mr. Anastos was not retained by the government until the fall of 1992. In preparation for his testimony he reviewed the government contracts, the correspondence files, and specifications for the project. He also reviewed plaintiff's correspondence, design submittals and the computer analysis. He reviewed the weather reports from the storm on January 6 & 7, and for January 19 as well as newspaper reports from that day. He reviewed photographs of the structure before and after the collapse as well as a video of the structure after the collapse. Additionally, he reviewed four separate reports examining the cause of the collapse: one by the Pickering firm; one by Spandome; one by CERL; and, one by Garver and Garver. Finally, Mr. Anastos made two visits to the site: one in November 1992; and, one in December 1992.

### A. *Design Submittals*

Mr. Anastos cited errors and deficiencies in plaintiff's design submittals. Mr. Anastos criticized the computer modeling of the structure. He found it crude and simplistic, improperly analyzing the structure as it was built.[15] Mainly, the problem was that plaintiff did not consider in its design the interdependency of a two dome structure with a connecting valley. Instead, plaintiff based its analysis on one separate dome with quar-

ter symmetry. This presupposes a uniform response of the entire valley based on the computations of one corner. Mr. Anastos averred that this was a fatal flaw because the valley is totally independent of the structure.[16]

The second problem had to do with arch tilt. Arch tilt is the out-of-plane rotation of the arch.[17] Mr. Anastos testified that Spandome relied very heavily on arch tilt to balance unbalanced loads.[18] Mr. Anastos stated, however, that the design submittals did not actually analyze arch tilt by computer or even hand analysis for the structure. Basically, Mr. Anastos charged that plaintiff simply concluded, with no accompanying analysis, that arch tilt will balance all unbalanced loads.[19]

Thirdly, Mr. Anastos found that the arch was not built as it was analyzed. Specifically, it was analyzed as a single member, but in reality it was comprised of a lot of separate members.[20] Mr. Anastos contended that proper analysis would include all the members in the computation. Finally, Mr. Anastos testified that he could find no analysis whatsoever on the effect of safety cables.[21]

### B. *Detailing the Spandome I Structure*

Mr. Anastos, explained that detailing is "basically putting all the pieces together and figuring out how the elements will be connected and designing that connection and drawing it up."[22] Typically this occurs at the end of the analysis.

Mr. Anastos charged that the structure, as designed, showed the fabric going over the arches, where in reality it was connected to the arches.[23] This was problematic because the bolt that the cable bears against was put in a distance away from the edge of the cable. Consequently, the fabric pulled on the cable, and the bolts pushed through the fab-

---

**15.** Tr. 297(17–20).

**16.** Tr. 298(7–8).

**17.** Tr. 299(8–10).

**18.** Tr. 299(11–12).

**19.** Tr. 300(1–4).

**20.** Tr. 300(6–10).

**21.** Tr. 301(23–25).

**22.** Tr. 302(21–23).

**23.** Tr. 303(18–20).

ric.[24] Thus, in order to engage the bolt, the fabric had to move, eventually initiating tears in the fabric.[25] Additionally, the fabric bore against the edge of the angle of the bolt, which was not rounded, but beveled. The fabric hitting the bevelled edge also caused tears. Thus, the fabric's strength was tremendously weakened by the rips.[26]

The third problem was with the cables themselves. Mr. Anastos testified that when a cable moves there is a certain radius with relationship to the diameter of the cable that must be rounded so it won't damage the strands of the cable.[27] The building code requirement for the use of cable in other buildings is about a 13 to 15 inch radius; in Spandome I, it was a one inch radius. Mr. Anastos believed that the failure of any one of these cables would cause a collapse.[28]

Finally, Mr. Anastos testified that the connection of the safety cable to the arch truss was inadequate.[29] The purpose of the safety cable is to hold up the arch in case of an arch rip. Mr. Anastos stated that the eye bolt, as installed, only had 800 pounds capacity to keep a 20,000 pound arch from falling down in the event of a major tear or rip.[30]

### C. Collapse Scenario

Mr. Anastos theorized for the court what happened on the morning of January 19, 1988. Based on eyewitness statements and photos, and interviews, Mr. Anastos estimated that the load on January 19, 1988, was 74,000 lbs., but since some of the snow had melted etc., he reduced the figure down to 61,000 lbs.[31] Mr. Anastos established that the load in the valley pulled the arches in the center which stretched the fabric. The interior arches of the dome moved inward while the exterior arches moved away from each other in response to the load. The exterior tripod legs were then put in tension. Due to the stress, the preexisting tears grew into a major rip, which released a great deal of energy leading to the dynamic reaction. The eye bolt snapped, and the arch fell. The safety cable was of limited use because it only had a capacity of 800 lbs, but the estimated force on the cable was about 12,000 lbs.[32] Mr. Anastos concluded that "the ponded water coupled with the tears in the fabric created loads and stresses on the Spandome that led to its collapse." [33]

### D. Plaintiff's Response

Mr. Arpad Kolosvary testified as an expert on behalf of his company. In response to Mr. Anastos' charges, Mr. Kolosvary began with defending his calculations of the snow load in the valley. Mr. Kolosvary visited the site on January 8 or 9, before the collapse to view the "bagging" of snow in the valley which resulted from the previous day's snow showers. Mr. Kolosvary testified that he did in fact calculate it being necessary to carry a load in the valley, but that the calculations may not have all been included in the design submittal.[34] Nevertheless, when he visited Spandome I before the collapse, he recognized that the fabric deflected considerably more than he calculated.[35] He defended his structure's design, arguing that the sag was caused by misrepresentations of the manufacturer of the fabric, and that it is not customary to test every piece of fabric used.[36] Mr. Kolosvary acquiesced, however, that the defect in the fabric would still be his responsibility.[37]

Mr. Kolosvary determined that some remedial measures would have to be taken in

24. Tr. 304(1–22).

25. Id.

26. Tr. 305(6–9).

27. Tr. 307(20–24).

28. Tr. 307(24–25); 308(1–9).

29. Tr. 309(1–2).

30. Tr. 309(2–25); Tr. 311(3–4).

31. Tr. 313(18–24); Tr. 314(15–25).

32. Tr. 321(2–25).

33. Tr. 316(15–17).

34. Tr. 551(13–25).

35. Tr. 552(10–15).

36. Tr. 552(10–15).

37. Tr. 629(6–11).

order to make up for the elongation in the fabric, however, he did not believe there was any structural consequence of the large bag in the valley.[38] Mr. Kolosvary also testified to the preexistence of tears in the fabric before the collapse, but insisted that the tears did not endanger the structure.[39] Further, he determined "by looking up" that there was not a problem, and that he would return to repair it when the snow melted.[40] This is in contrast to the testimony given by Mr. Anastos, whose response would have been to immediately repair the rips and have the snow and water removed from the valley.[41]

In defense of his attachment of fabric to the arch, Mr. Kolosvary explained that there are various permissible methods, and that he has used this technique for twenty years. Mr. Kolosvary demonstrated that he pulls the fabric over where the bolt will be and makes an incision.[42] The slit is opened over the bolt, and then the cable is pulled down, but it does not bear against the knot as Mr. Anastos demonstrated. The hole, however, is not big enough to get down past the knot, and thus the fabric bears on the round bolt, not the sharp knot.[43]

On the issue of arch tilt, Mr. Kolosvary initially stated that it was not proposed in the design submittal. He stressed, however, that one was prepared. Mr. Kolosvary testified that he does not typically submit less than the critical load conditions.[44] Nevertheless, he complied when he was later asked to submit the analysis. On cross examination, however, Mr. Kolosvary testified that in his computer analysis he did not analyze for arch tilt.[45] Further, he testified that in the computer analysis he did not analyze for asymmetrical snow load.[46] Moreover, Mr. Kolosvary never gave a full response regarding his calculations for load in the valley. It remains unclear whether he only evaluated one quadrant, or whether his analysis considered the entire valley.[47]

As the court previously determined, the collapse of Spandome I did not result from severe winds. Further, the court accepts the government's theory that the load of the ponded water created extreme tension which eventually caused the fabric to malfunction. What must be determined, however, is whether these circumstances resulted from a latent defect in plaintiff's design.

The court finds the evidence given by Mr. Anastos credible and convincing. Mr. Kolosvary failed to properly analyze for arch tilt, but only relied on it as a theory. This led to latent defects in the structure. Depending on his assumptions, Mr. Kolosvary did not account for the unbalanced loads which accumulated in the valley, consequently leading to the collapse. Additionally, the safety cables were not designed to withstand the load which accumulated in the valley and could not serve their function in response to the energy released when the north dome finally collapsed. The court agrees that these miscalculations were latent design defects which were not discoverable by reasonable inspection.

Furthermore, both parties agree that the structure did not behave as guaranteed. The water should not have ponded in the valley, but should have run off the sides. Whether or not it is Mr. Kolosvary's custom to test every piece of fabric, he admitted that the "flexibility" of the fabric was not predicted. As previously discussed, Mr. Kolosvary testified that he understood that he was fully responsible for any defects in the fabric; and, even though the water ponded in the valley, that load, theoretically, should not have resulted in the large deflection in the fabric. Therefore, Mr. Kolosvary should have taken steps prior to the collapse to

38. Tr. 553(8–15).

39. Tr. 558(1).

40. Tr. 558(16–18).

41. Tr. 746(11–15).

42. Tr. 555(9–10).

43. Tr. 555(12–18).

44. Tr. 565(3–20).

45. Tr. 660(3).

46. Tr. 660(13–14).

47. Tr. 588(11–17).

repair, not only the sag in the valley, but, the tears in the fabric as well. Nonetheless, it is likely that the same circumstances would have reoccurred due to the inherent defects.

### III. *Post Acceptance Rights*

■ The contract included Warranty Clause FAR 52.246–21. 48 C.F.R. § 52.246–21 (1985). The court finds, however, that this warranty is no longer applicable because it only continued "for a period of 1 year from the date of final acceptance of work ..." § 52.246–21(b). Because Spandome I was finally accepted on July 22, 1986, the warranty no longer applied on January 19, 1989. Under sub-paragraph (h), however, "[i]n the event the Contractor's warranty under paragraph (b) of this clause has expired, the Government may bring suit ... to enforce a subcontractor's, manufacturer's, or supplier's warranty."

Assuming § 52.246–21(h) applies, the government could take advantage of the contractor's warranty for the "fabric canopy and related components" for a period of five years, agreeing to "repair or replace any work which deteriorates excessively (i.e. at a rate which will reduce the specified service life or render the structure unfit for intended use) or otherwise fails to perform as required due to failure of materials or workmanship." The contractor's warranty is specific, and does not afford the same rights and obligations as Warranty Clause FAR § 52.246–21. Strictly construing Spandome's warranty, the contractor was only obligated to repair or replace the goods; therefore, based on a breach of warranty, the government cannot recover any other costs. *See O.F. Paulsen Constr. Co.,* 79–1 BCA ¶ 13,623, 1978 WL 2486 (1978) (rental costs of replacement generator were not included among remedies in guarantee clause, therefore, they were not recoverable); *Kalcor Coatings Co.,* 75–2 BCA ¶ 11,422, 1975 WL 1419 (1975) (warranty gave government right to either correct, replace, or dispose of defective goods and charge the costs to contractor; refund of the purchase price was not included as one of the remedies and, therefore, was not allowed).

■ The government can still recover other costs, however, based on the "Inspection of Supplies—Fixed Price" clause, FAR 52.246–2 (APR 1984), which was also incorporated into the contract. This clause requires the government to accept or reject supplies as promptly as possible after delivery. Most importantly it states that "acceptance shall be conclusive, except for latent defects, fraud, gross mistakes amounting to fraud, or as otherwise provided in the contract." It also provides that if acceptance is not conclusive:

"the government, in addition to any other rights and remedies provided by law, or under other provision of the contract, shall have the right to require the contractor (1) at no increase in contract price, to correct or replace the defective nonconforming supplies at the original point of delivery or at the Contractor's plant, at the Contracting Officer's election, and in accordance with a reasonable delivery schedule as may be agreed upon between the Contractor and the Contracting Officer; provided, that the Contracting Officer may require a reduction in contract price if the Contractor fails to meet such delivery schedule; or (2) within a reasonable time after receipt by the Contractor of notice of defects or nonconformance, to repay such portion of the contract as is equitable under the circumstances if the contracting officer elects not to require correction or replacement.

(k) ... Acceptance shall be conclusive, except for latent defects, fraud, gross mistakes amounting to fraud, or as otherwise provided in the contract.

(*l*) If acceptance is not conclusive for any of the reasons in paragraph (k) hereof, the Government, ... shall have the right to require the contractor (1) at no increase in contract price, to correct or replace the defective or nonconforming supplies ... or (2) within a reasonable time after receipt by the Contractor of notice of defects or nonconformance, to repay such portion of the contract as is equitable under the circumstances if the Contracting Officer elects not to require corrections or replacement."

Under the Inspection Clause, the government usually seeks to have the contractor repair or replace the defective work. *Kaminer v. United States,* 203 Ct.Cl. 182, 488 F.2d 980 (1973). If, as in this case, the contractor refuses to correct the defect, the government may do so and recover any reasonable cost incurred. *Kordick & Son, Inc. v. United States,* 12 Cl.Ct. 662 (1987). Upon proper revocation of acceptance, the government also has the right to return the items to the contractor and demand the return of the purchase price. *Catalytic Engineering & Manufacturing Corp.,* 72–1 BCA ¶ 9342, 1972 WL 20918 (1972). The material must be returned to the contractor unless it is utterly worthless. *Teltron Inc.,* 72–2 BCA ¶ 9502, 1972 WL 1267 (1972). Even if the items are worthless, the contractor should be credited with the scrap value. *Atlantic Hardware & Supply Corp.,* 66–1 BCA ¶ 5378, 1966 WL 358 (1966).

Although the government originally partially terminated this contract for default on March 25, 1988, the entire contract was terminated for default on February 13, 1989. At that time, the government notified the contractor to take action to remove the remaining dome, which continued to stay erect after the January 19, 1988, collapse. Curiously, the government waited until May 26, 1989, (16 months later) to dismantle that dome. Evidently, the government had full use of the dome until that time. Apparent from the parties' correspondence, there was discussion of removing the remaining structure beginning in February 1989. In Ms. Dubose's letter notifying the contractor that the entire contract has been terminated for default, plaintiff was also informed that Ms. Dubose was happy to "discuss your arrangements for a timely removal of the structure, but unless such arrangements are confirmed within ... 10 days ... and preceding March 20, 1989, I will be forced to purchase the removal work for your account." On March 3, 1989, Mr. Kolosvary responded and referenced a meeting (tentatively set for March 17) in Memphis "to negotiate a termination settlement and to discuss the removal of the berme area Spandome." [48] On April 10,

1989, another letter from Mr. Kolosvary offered to dismantle the remaining one half of the original structure as part of a $20,000 settlement. On May 25, 1989, however, Spandome was notified that the structure would be taken down the next day.

This notification was inadequate. While the contractor believed he was still negotiating a settlement, a one day notice was issued to dismantle the structure or be faced with removal costs incurred by the government. Defendant waited 16 months before taking any action toward dismantling the remaining dome. The testimony offered at trial convinced the court that the structure was in no danger of immediate collapse. Instead, it is evident that the government no longer had a use for the remaining dome and wanted it removed. Defendant's telephonic notice giving the contractor 24 hours to remove the structure was clearly insufficient. Therefore, the contractor is not responsible to the government for those costs.

### Conclusion

The court has determined that the Spandome I contained latent design defects. Therefore, the government was within its right to require corrective action upon discovery of those defects. Because the contractor did not offer a plan of repair, the government is entitled to demand return of the purchase price, as well as any costs associated with cleanup from the collapse. Moreover, a termination for default has also been upheld where the contractor fails to correct or replace the items. *Jo–Bar Manufacturing Corp.,* 73–2 BCA ¶ 10,311, 1973 WL 1705 (1973).

Regardless of the remedy selected by the government, the contractor will be credited with the benefit which the government has obtained from the use or retention of the defective product. *Midwest Industrial Painting Inc., v. United States,* 4 Cl.Ct. 124 (1983). The contractor will receive credit for the government's use of the entire structure from July 22, 1986, through January 19,

---

48. Joint Exhibit 17 (3/3/89 letter from Spandome).

1988, as well as its use of the remaining dome until it was removed on May 26, 1989.[49]

Additionally, the government did not return the material to the contractor. The parties must determine the reasonable value of that material. If the parties agree that the material was worthless, the contractor should be credited with its scrap value.

 The government requested this court award interest from the time the default termination was rendered. Awards of interest to the government are discretionary with this court. *Astro—Space Laboratories, Inc. v. United States*, 200 Ct.Cl. 282, 312, 470 F.2d 1003 (1972). Although interest began to run from the day the CO rendered her final decision, the propriety of the termination was not determined until the court rendered this opinion. Therefore, the court will not penalize the contractor for the time which was necessary to resolve this bona fide dispute. While judgment in this case is for defendant, the government is not entitled to interest. Further, the court remands the issue of damages to the parties to determine the amount, affording the contractor any allowances conferred by the court in this opinion. The parties shall file a stipulation as to the amount of damages payable to the government within 60 days from the date this opinion is issued. Upon receipt of the stipulation, the Clerk of the Court is ordered to enter judgment for the defendant at that time without further order from the court. No costs.

---

49. The same consideration should be extended to the purchase price of the awning.